(Nos. 20458, 20459.—)

W. R. ROACH & CO. *et al.* Appellees, *vs.* GEORGE F. HARD-
ING, County Collector, Appellant.—THE HOOPESTON
CANNING COMPANY *et al.* Appellees, *vs.* GEORGE F.
HARDING, County Collector, Appellant.

*Opinion filed April 23, 1932—Rehearing denied June 8, 1932.*

JOHN A. SWANSON, State's Attorney, JOHN E. PEDDER-SON, LOUIS H. GEIMAN, and JAMES L. HENRY, (HAYDEN N. BELL, of counsel,) for appellant.

JOHN M. ZANE, HAROLD W. NORMAN, and CRAIG R. JOHNSON, for appellees.

WILLIAM H. SEXTON, Corporation Counsel, (LEON HORNSTEIN, of counsel,) for the city of Chicago, as *amici curiæ*.

Mr. CHIEF JUSTICE STONE delivered the opinion of the court:

There are here presented the appeals, consolidated, of George F. Harding, county collector, to review the decrees of the circuit court of Cook county entered against him on two bills filed in that court to enjoin the collection of certain taxes extended on assessments made by the board of review of Cook county. The complainants (appellees) in one case are W. R. Roach & Co., the Oconomowoc Canning Company, the Hoopeston Canning Company and Lansing

B. Warner, Incorporated. That case will, for convenience, be hereinafter referred to as the Roach case. The complainants in the other bill are the Hoopeston Canning Company, the Thomas Grocery Company, Beyer Bros.-Goshen and Lansing B. Warner, Incorporated. That case will hereinafter be referred to as the Hoopeston case. The bills are similar and governed by the same principles of law though there is a slight difference in the contracts involved. A demurrer was filed to each bill and overruled, and appellant abiding his demurrer, decrees were entered in accordance with the prayers of the separate bills.

Appellees are parts of two groups of reciprocal insurers, consisting of individuals, partnerships and corporations, styled "subscribers" in the Roach case and "principals" in the Hoopeston case. They are hereinafter styled subscribers. They exchange among themselves reciprocal or inter-insurance contracts providing indemnity against loss by fire, lightning, use and occupancy and sprinkler leakage. They operate through articles in the form of a power of attorney given to Lansing B. Warner, Inc., an Illinois corporation. In the Roach case the group is designated as "Canners Exchange Subscribers at Warner Inter-insurance Bureau" and in the Hoopeston case as "Warner Reciprocal Insurers." In the former case Lansing B. Warner, Inc., is styled in the contracts as "attorney" and in the latter case as "agent." These groups are exchanging insurance under and in compliance with the provisions of "An act concerning the business of reciprocal or inter-insurance," approved June 20, 1921. (Cahill's Stat. 1931, p. 1626.) The Roach group on and prior to April 1, 1927, the year in which the assessments in these cases were made, consisted of 882 subscribers, 46 of which resided in the State of Illinois and 836 in other States or countries. The Hoopeston group consisted of 1390 subscribers, 42 residing in Illinois and 1348 in other States and countries. The contracts creating Lansing B. Warner, Inc., as attorney in fact or agent of

these groups are in the main the same, varying, however, in some details hereinafter pointed out. By this contract the subscriber agrees to exchange insurance of the character therein mentioned with other subscribers. As, for example, subscriber "A" agrees to insure each of the other subscribers in the amount desired by such subscriber, but in the proportion, only, which "A"'s insurance bears to the whole amount of insurance on all such contracts, "A"'s liability to be several and for such proportion, only, of all losses, including his own, as the amount of his insurance bears to the total insurance of all. "A" stipulates that he and other subscribers shall not be a corporation, mutual company or an association, but shall make, and do make, separate contracts, each subscriber exchanging indemnity with each of the other subscribers. Each contract defines the separate individual liability of its maker on each other policy put out, and stipulates that if a loss occurs, its maker, as a subscriber, shall pay his part and shall not be responsible for the liability of any other subscriber. Each contract stipulates that for convenience, and by reason of necessity arising out of the fact that the subscribers are scattered over the United States and elsewhere, the subscriber agrees to give, and does give, to a common agent or attorney in fact a separate power of attorney to sign and issue policies and to perform other acts and exercise other powers designated in the contract. Each agrees that he, with all others signing like contracts, is to become a subscriber to the policies issued at the office of such agent or attorney. Each promise to indemnify has for its consideration a like promise of other subscribers. The contract provides that no premium shall be paid and no insurance purchased from an outside company or person. There is no common agreement signed by all but each subscriber makes a separate agreement as to his separate liabilities and rights.

In order to prevent collection from each subscriber for losses or expenses as they occur and in order to provide

security for the performance of each subscriber, and, doubtless, to comply with the statute hereinbefore mentioned, the contract provides that a sum shall be deposited by each subscriber in proportion to the amount of insurance taken by such subscriber, the amount to be determined by the attorney, which sum is to be held as the separate property of each subscriber for the purpose of meeting the liabilities arising on his contract. Each subscriber's liability for losses and expenses is in proportion to the amount he deposits and is his individual liability. A council of five advisers is provided, with powers specified in the agreement. The attorney or agent is to act as secretary to these advisers when in meeting. The powers and compensation of the attorney in fact and the advisers are designated in the contract, as are the method for handling the guaranty deposits, adjustment and payment of losses, keeping books at the agency and setting up the monthly "savings account" as styled in the Hoopeston case, or "surplus" as styled in the Roach case, with the unused portions of the deposit allotted to that month. The contract provides for the establishment of a reserve fund, which in the Hoopeston case is formed from such monthly savings account and in the Roach case by an additional deposit by each subscriber over the amount of his guaranty deposit. In the Hoopeston case the guaranty deposit represents the total amount deposited by each subscriber, and from this total deposit, after payment of the losses and expenses, the reserve is augmented. In the Roach case the subscriber pays, as a part of his initial deposit and in addition to the guaranty deposit, the sum of $10, or more if required, to the reserve fund. This, with certain additions of savings, if such there are at the end of the year, is the total reserve fund in that case. It is conceded that either plan of setting up a reserve fund complies with the statute mentioned.

These total deposits are managed in the following manner: The guaranty fund of each subscriber is divided into

equal monthly amounts according to the number of months for which the policy is to run. From the current monthly installment, styled in the Hoopeston case "liability factor" and in the Roach case "monthly amount," are met the losses and expenses for that month for which the fund is liable, and the balance is at the end of the month placed to the credit of the subscriber in a surplus fund styled as above stated. By a process differing slightly in the two cases, as we have seen, a reserve fund is created and credited to each subscriber in proportion to his original deposit. This fund is to be drawn upon if the portion of the guaranty fund set aside for each month is insufficient to meet losses and expenses for that month. The agreement provides for a return to the subscriber at the end of each calendar year that portion of the savings account in excess of the amounts stipulated in the agreement to be kept for the reserve fund. Upon expiration of the insurance term without renewal or cancellation of the contract the subscriber ceases to be such and a statement of his account is within sixty days to be rendered to him, with re-payment to him of any balance in his account of unused deposits, including reserve. Each contract provides that each subscriber's share of the funds, from whatever source obtained or saved, as well as the reserve fund, shall be the property of each subscriber and carried in his account as a credit to him and his share of losses and expenses deducted therefrom in the proportion which his deposit or insurance bears to the total deposits or insurance of all. This is the oldest known form of inter-insurance.

Appellees in the Roach case complain by their bill of an assessment made by the board of review on a valuation of $941,000 fixed by it against such appellees under the name "Canners Exchange Subscribers at Warner Inter-insurance Bureau," resulting in a tax of $46,955, and in the Hoopeston case appellees complain of an assessment by the board of review on a valuation of $254,000 fixed by it against

"L. B. Warner, Inc.," resulting in a tax of $12,674. The position of appellant is that the tax in each of these cases is a tax on the reserve fund of an inter-insurance exchange having its existence by virtue of statutes of this State and therefore possessing the general character and attributes of a corporation; that by the statute the advance deposits required of the subscribers are to be considered as its capital stock, and the reserve fund required by the act to be established is for the protection of the interests of the corporators; that these funds are therefore taxable at the principal place of business of the inter-insurance exchange as other funds of corporations are taxable, or if this is not true and the funds in the hands of Lansing B. Warner, Inc., as attorney in fact or agent, are, as contended by appellees, credits belonging to the individual subscribers, they are properly taxable in the hands of the attorney or agent under clause 2 of section 6 of the Revenue act, requiring every person to list all moneys, credits and other personal property invested, loaned or otherwise controlled by him as the agent or attorney or on account of any other person, company or corporation. Appellees, on the other hand, argue that these contracts do not create a corporation or other entity of any character, and that the property sought to be taxed in these cases cannot be considered as the reserve of any alleged entity of a corporate nature. Concerning the alternative contention of appellant, they say that the property sought to be taxed constitutes credits belonging to the individual subscribers, and that the attorney or agent is not given the power or control over these credits requisite to bring them within the second clause of section 6 of the Revenue act. It is alleged in the bill that the resident subscribers listed their portion of these credits for taxation at their places of residence, and that the credits belonging to non-resident subscribers are not taxable in this State as credits in the actual control of an agent.

First, then, may be considered the question whether appellees are a part of a corporate or other legal entity. Their contracts specifically state that they shall not be a corporation, mutual company, association or any entity of such character. The recital of such intention, however, is not controlling. If it be seen from the contract entered into and the construction of the act relating to inter-insurance exchanges that such groups have constituted themselves a legal entity under the act, the statute will, of course, control. The act, as its title indicates, is for the purpose of regulating the business of reciprocal or inter-insurance, and permits individuals, partnerships or corporations to exchange reciprocal or inter-insurance contracts with each other or with individuals, partnerships and corporations of other States and countries for the purpose of indemnifying themselves against three classes of losses: First, fire, lightning, hail, windstorm, use and occupancy or sprinkler leakage insurance or any variety thereof; second, loss or liability arising from bodily injury, death by accident, disability, sickness or disease or liability arising under the Workmen's Compensation act; third, glass breakage. This act declares that such contracts, and the exchange thereof and the parties thereto, are to be regulated by it and by no other law relating to insurance unless referred to in this act or if later enacted which is rendered expressly applicable by the language thereof. The act declares that the attorney in fact or agent may be a corporation, and that the office of such attorney in fact is to be maintained at such place or places as may be designated by the subscribers in the power of attorney.

The act provides that before any contracts for inter-insurance shall be made, the attorney in fact shall file with the Director of Trade and Commerce a verified declaration setting out the following: The name of the attorney in fact and the name or designation under which such contracts are to be issued, which name shall not be so similar

to any other designation adopted by an insurance organization in this State as to cause confusion or deception; a statement of the kind or kinds of insurance to be exchanged as permitted by the act; a copy of the contract of insurance and power of attorney or other authority of such attorney in fact, and the location of the office or offices from which such contracts or agreements are to be issued. If the Director of Trade and Commerce shall be satisfied that this declaration is in proper form he is required to issue a certificate of approval, which gives to the attorney in fact authority to solicit subscribers "at the exchange," though no policies of insurance can be issued until other following provisions of the act are complied with. Section 5 of the act enumerates definite requirements concerning the number of applications for insurance and the amount of insurance represented which shall first be received by the attorney in fact, with the amount of advance deposits to be collected, before the license shall be issued. When this is done to the satisfaction of the Director of Trade and Commerce and reported to him he shall issue a license to the attorney in fact (section 6) authorizing him, "in the name of the subscribers at said exchange, to issue policy contracts to said subscribers." The act also requires by section 7 that there shall be a reserve fund equal to fifty per cent of the aggregate net annual deposits collected and credited to the accounts of subscribers on policies having one year or less to run and *pro rata* on those for longer periods, or in lieu thereof one hundred per cent of the net unearned deposits collected and credited to the accounts of the subscribers. The section further provides that "in estimating the financial condition of any exchange there shall be allowed as admitted assets, assessments actually levied and in process of collection not over ninety days due." Section 8 designates the kinds of insurance which any one exchange may transact. By section 9 the Director of Trade and Commerce is authorized to make "an examination of

the condition and affairs of any exchange organized under this act having its principal office in this State," and by section 10 the attorney in fact is required to make an annual report to the director for each calendar year "showing the financial condition of affairs at the office of the exchange." It is provided by section 14 that action may be brought against all the subscribers by serving process on the attorney in fact or the Director of Trade and Commerce and by no other means. By section 16 the amounts of advanced deposits required are specified according to the kinds of business transacted. If it shall appear on examination that such amounts of advanced deposits have not been accumulated, the attorney in fact or the subscribers shall advance such sums as are needed to comply with the act. The act also specifies in section 17 the fees to be paid to the Director of Trade and Commerce "in the organization and operation of exchanges under the provisions of this act." By section 20 it is provided that if the attorney in fact of any exchange with its central office in this State shall refuse or neglect to pay any valid judgment rendered against the subscribers, the Director of Trade and Commerce shall report the same to the Attorney General, with the request that an injunction be sought "restraining said attorney in fact from further operation of said exchange, and the court on granting such injunction may also appoint a receiver to take charge of the assets of the subscribers of the exchange and wind up its affairs."

It will be observed that this act does not require that the exchange be incorporated or constitute it a corporation or partnership or mutual benefit association. The subscriber's contract, by limiting his liability and interest to that represented by the amount of his policy and deposits in proportion to the entire amount of insurance and deposits, does not indicate the formation of any such legal entity. But can it be said that no legal entity or association of any character is organized by the plan here adopted? The act

designates this group as an "exchange." May this exchange be said to be an association? The term "association" is used to designate a body of persons acting together without a charter but on methods and forms used by incorporated bodies for the prosecution of some common enterprise. The term does not have, in law, a fixed meaning such as is accorded to partnerships or corporations but is used to indicate a collection of persons who have joined together for a certain object. Our statute does not contain a definition of an association. It has, however, been defined in Bouvier's Law Dictionary (vol. 1, 269,) as persons uniting together for some purpose. Black's Law Dictionary defines "association" as the act of a number of persons who unite or join together for some special purpose or business; "the union of a company or business for the transaction of designated affairs or the attainment of some common object." This definition, in substance, was adopted by this court in *People* v. *Brander,* 244 Ill. 26, and may be said to be the definition of that term as recognized in this State.

Whether under the act regulating inter-insurance appellees may be said to be parts of an association is to be determined from the act itself. By the first section the word "exchange" is defined to mean "the office of the attorney in fact, being the place where the contracts of indemnity are issued." By section 7, as we have seen, the exchange is required to keep on hand a reserve fund. Section 9 provides for an examination by the Director of Trade and Commerce "of the condition and affairs of any exchange organized under this act having its principal office in this State," and, as we have seen, it is concerning "the financial condition of the affairs at the office of the exchange" that the attorney is required by section 10 to report to the director. By section 12 "all exchanges heretofore licensed" shall be penalized for failure to comply with the act. Section 16 again refers to the attorney as "the attorney in fact of all exchanges now authorized to do business in this State,"

and, as we have seen, by section 20, on failure to pay a judgment against the subscribers at the exchange, further operation of the exchange may be enjoined and a receiver appointed to take charge of "the assets of the subscribers of the exchange and wind up its affairs." And lastly, section 24 authorizes "any exchange operating in this State" to "consolidate with or re-insure its entire business in another exchange." If such an exchange is not an entity cognizable in the law it is difficult to conceive how it could have a "financial condition," or how "its affairs" could be wound up, or how it could be "organized under this act," or how it could be "heretofore licensed" under the act. These provisions of the statute designating the existence of an exchange constitute it a legal entity and by the terms of the act capable of holding property. Whether it is contemplated by the act that the exchange shall hold property independent of the subscribers it is not necessary for the determination of the questions here involved to decide. It seems clear, however, that the exchange, which by section 1 of the act is defined as "the office of the attorney in fact, being the place where the contracts of indemnity are issued," is intended to mean more than a mere place, for it scarcely could be said that a license would issue to a place or that a place would have business affairs or financial condition. It clearly appears from the act that it is intended that the attorney in fact at his or its office, operating under the provisions of the act, constitutes the exchange; that the exchange is a legal entity capable of holding property for the purposes for which such exchange is organized, and that the property here sought to be assessed, though credits belonging to each individual subscriber, as alleged in the bill, is in the hands of this attorney in fact or agent at the exchange—that is, in the hands of the exchange.

Counsel for appellees argue that as these credits belong to the several subscribers, and though they are at the exchange, there is no duty on the part of the attorney in fact

to list them for taxation, because he does not have such control over them as is contemplated by the Revenue act, requiring that moneys or credits of another under the control of an agent shall be listed for taxation by such agent. This brings us to a consideration of these clauses of the Revenue act.

By the first clause of section 6 of that act it is required that "every person of full age and sound mind, being a resident of this State, shall list all his moneys, credits, bonds or stocks, shares of stock of joint-stock or other companies * * * moneys loaned or invested annuities, franchises, royalties, and other personal property." The second clause is: "He shall also list all moneys and other personal property invested, loaned or otherwise controlled by him as the agent or attorney, or on account of any other person or persons, company or corporation whatsoever, and all moneys deposited, subject to his order, check or draft, and credits due from or owing by any person or persons, body corporate or politic." Section 9 directs that the place where property in the hands of agents shall be listed and assessed shall be "where the business of such agent is carried on."

It is alleged in the bill and admitted by the demurrer that the resident members of these exchanges listed at their residences the credits involved here belonging to them, and it is argued that a resident agent has no authority, regardless of the extent of his control over credits belonging to residents of the State, to list such credits for taxation, but that such agent's authority is limited to credits under his actual control belonging to non-residents. It was held in *Reat* v. *People*, 201 Ill. 469, *Matzenbaugh* v. *People*, 194 id. 108, *Hayward* v. *Board of Review*, 189 id. 234, *People* v. *Davis*, 112 id. 272, and *Goldgart* v. *People*, 106 id. 25, that credits belonging to non-residents in the hands of resident agents and in actual control of such agents for renewal or collection, with the view of re-loaning the money represented by the same as a permanent business or conducting

the business of the owner, constitute subject matter having the nature of stock in trade in such business and so having a situs at the place of business of the agent. This is conceded to be well settled. But the question whether money and credits in the hands and under the actual control of an agent resident in Illinois but belonging to a resident of this State is to be listed for taxation by such agent was not passed upon in the above cited cases. That property shall not be required to twice respond in taxes is, of course, conceded by everyone. It will be observed that the plain provisions of the first and second clauses of section 6 of the Revenue act are that every resident of this State of full age is required not only to list his own moneys and credits but he shall also list all moneys and credits invested, loaned or otherwise controlled by him as agent. This clause imposes a duty on the agent who actually controls the moneys or credits of another, to list them. There appears to be no limitation as to the residence of the owner of such property. It will be observed that clauses 1 and 2, in stating the duty of every adult sane person to list property, require that he list all moneys and credits controlled by him as agent. While, as was said in *Goldgart* v. *People, supra,* credits, "in the absence of anything showing they have a situs elsewhere, accompany him," the owner, the contracts here clearly show these credits to have a situs with the exchange which controls them.

Construing these two clauses together, as they must be construed, it is evident that the legislature intended that the resident owner of credits, which are intangible, or of tangible personal property should be required to list only those which were under his actual control and that his agent having actual control of moneys or credits belonging to such resident owner is required to list them. This construction finds basis in logic, for the agent in control is better able to present a just list of moneys and credits for taxation than the owner, whether such owner be a resident

or non-resident. When the agent of the owner, rather than such owner, is the one exercising actual control over the property, it is but reasonable that he, rather than the actual owner, shall return the same for taxation. Such agent then stands in the place of the owner. We are of the opinion in this case that if the moneys and credits of the subscribers to these exchanges are under the actual control of the attorney in fact at the exchange it was its duty to list them, both as to resident and non-resident subscribers.

It is alleged in the bill that certain of the funds have been invested in United States government bonds, which are not taxable and therefore should not be listed. It is also averred in the bill and admitted by the demurrer that the property at these exchanges constitutes credits belonging to the subscribers. It is therefore of no importance here in what form securities are held. The thing to be assessed is the subscriber's interest, which on settlement entitles him merely to so much money. He is not, under his contract, entitled to call for a portion of these bonds in such settlement and has no interest in them in specie. His interest lies in credits.

Counsel for appellees earnestly argue that the control of the agent or the attorney in fact in these cases was not sufficient to bring such agent or attorney in fact within the contemplation of the law requiring that an agent list credits in its actual control, and they ground this argument on the provisions in the contracts in both of these cases that there shall be a committee of advisers having at least partial control of these credits. They say, and the bill alleges, that the control of these moneys or credits was not in any resident of Illinois and that the demurrer admits these allegations. The bill sets up the facts of the agency, and whether the agent has actual control of the funds or credits sought to be taxed is a conclusion of law to be deduced from the facts which the demurrer admits, and, of course, the demurrer does not admit conclusions of law. The attorney

in fact, under these contracts, has power to execute the contract with each subscriber. It may determine the amount of the guaranty deposit in accordance with the risk, amount and terms of the insurance covered thereby. It keeps the accounts of each subscriber. In the Hoopeston case it is to deposit all moneys in banks approved by the majority of the advisers. Such funds are subject to its check or draft signed by it and countersigned by one of the advisers or by someone appointed by a majority thereof. It may invest any funds of the principal with approval of the majority of the advisers. In case of claim of loss the agent takes the funds of the subscriber for the latter's proportion of the claim and places the same in a separate account, which account is subject to its check, alone. This account is used to pay the subscriber's liability for loss. The agent or attorney may deduct its compensation from the funds of the subscriber and such expenses as it is required to pay. It, with the approval of the advisers, makes up the reserve fund from the savings account. It alone issues policies and renewals, cancels or extends insurance, gives all notices, determines the terms of the policies in accordance with the contract so long as within the provisions of the contract, adjusts, compromises or settles claims, prosecutes or defends or settles suits and may employ counsel, and appoints agents or representatives in other States. The contract provides that the agent may do and perform every act necessary or proper to carry out the authority and conditions of the contract, including execution and acknowledgment when necessary, and delivery of all documents and papers. In both of these contracts is listed the character of expenses to be paid by the exchange, and among these are taxes. The powers of the attorney or agent in the Roach case differ somewhat so far as the handling of the funds or investment in securities is concerned, the provision in that contract being that the funds and securities shall be in the hands of the advisory committee, less

such sums as the attorney is authorized to deduct. The advisory committee shall determine the investment and safekeeping of such moneys, and shall pay out funds by voucher check approved by the attorney and signed by two members of the advisory committee designated by a majority of them. Aside from the care for the funds in the manner indicated the powers of the attorney are similar to those in the Hoopeston case, with the additional power to terminate the subscriber's contract and cancel the power of attorney on five days' notice.

These facts are urged by appellees' counsel as showing that the power of control of these moneys and credits is not in the hands of the agent, but, in effect, in the hands of the advisory committee. The members of these advisory committees, however, are subscribers who are elected for the purpose of representing all the subscribers, and are, in fact, additional agents of the subscribers. They hold their meetings at the office of the attorney in fact, where all of the records of the exchange are kept. The activities of the advisers therefore take place at the office of the exchange. They are a part of the exchange as agents of the other subscribers. The individual subscriber has no more control over his credits by reason of the existence of an advisory committee than he would have if there were no such committee. He is given greater assurance of the use of his funds and credits for the purpose for which they are intended, but such control as the advisers exert is not the control of the subscriber but the control of his agents. The advisory committee acts, as its name indicates, in an advisory capacity. The contracts state that the purpose of having the advisers is for the benefit of the subscribers as well as the attorney in fact. The supervision of these advisers does not take the management and actual control out of the hands of the agent, as they are a part of the agency. The fact that part of the advisers may live out of the State is of no consequence, as their activities are carried on at

the office of the exchange. The powers and duties of the advisers concerning the expenditure of moneys rests, in the Roach case, on the approval of the attorney, and in the Hoopeston case the attorney has that power subject to the approval of a representative of the advisers. It cannot be said because the exchange is divided into a system of checks and balances, and therefore in the actual control of more than one person, that moneys and credits on hand are not in the actual control of an agent of the owner. There may well be more than one member of an agency. The advisers and the attorney constitute the exchange, which holds and is in actual control of the moneys and credits belonging to the subscribers. If it be that such a division of an agent's powers places actual control of the moneys and credits of the subscribers in the hands of those not agents, then may all duties and responsibilities arising out of such an agency be thus avoided. Such a situation is without the contemplation of the relationship of principal and agent.

We are of the opinion that these moneys or credits are within the actual control of the exchange as the agent of the subscribers, as contemplated by clause 2 of section 6 of the Revenue act, and that it was the duty of such agent to list them for taxation. The fact that resident subscribers have listed at their residences the portion of these credits belonging to them does not change the construction of these contracts or the law applicable thereto. They were not required to so list them.

Counsel for appellees argue, however, that the records of the board of review show that the property was improperly assessed. In the consideration of this objection it is necessary to treat these cases separately. In the Roach case the bill alleges and the demurrer admits that on or about July 15, 1927, a personal property complaint was filed by and with the board of review of Cook county on one of the forms prepared and used by that board for that purpose. It set out that the valuation placed on the

property "below mentioned is not just for the following reasons." The "class of property" was there designated as insurance. The address of Lansing B. Warner, Inc., 155 East Superior street, was given as the place where the property was assessed. This complaint shows that no assessment had been made by the board of assessors. The name of the party against whom the complaint was filed is, "Canners Exch. Subscribers at Warner Inter-Ins. Bureau." On this instrument appear the following: "Admitted assets $2,744,064 x 5% $137,203.20," "surplus $1,881,056," and carried out on the same line is the sum "$941,000," also "board of review assessment of all personal property $137,203." This last statement indicates that the assessment by the board of review had been placed at $137,203, though it appears from the bill that no previous assessment had been made either by the board of review or board of assessors. On page 105 of the docket record of the board of review also appears the item, "estimated value $941,000." It appears from this docket that the board of assessors made no valuation for the previous year nor was any valuation made by the board of review for that year. It also appears on this same page of the docket that the valuation of the board of review as against "Canners Exch. Subscribers at Warner Inter-Ins. Bureau" was fixed at $941,000, although the records also show that the board of review assessment of all personal property was $137,203. The record indicates that the sum of $941,000 is determined by taking one-half of the surplus, which was listed at $1,881,056, though no explanation appears on the record as to how the latter sum is determined or how the board of review arrived at an assessment on all personal property at $137,203, except as five per cent of "admitted assets." It is alleged in the bill that on or about December 12, 1927, there was received at the office of Lansing B. Warner, Inc., attorney in fact for the subscribers, a notice from the board of review dated December 9, addressed to "Canners Exch.

Subscribers at Warner Inter-Ins. Bureau," requiring the addressee to appear before the board of review on December 15, and that the attorney in fact appeared by its counsel, who filed a statement in writing. The record of the board of review, however, shows that notwithstanding this notice to appear on December 15 the action of the board fixing the assessed value at $941,000 was taken and concluded on the 13th of December, 1927, or two days before the appearance of appellees' counsel.

It is clear from the record of the board of review that this was an original assessment; that no assessment had been previously made, either by the board of assessors or board of review, and counsel complain that the board of review had no authority or power to make such an assessment without specification or proof of the property upon which the assessment was based. The record shows that an assessment roll was made out and sent to the county clerk showing the "total full value" of the Canners Exchange Subscribers at Warner Inter-insurance Bureau to be $941,000 and "total assessed value as corrected by the board of review" the same amount, and the tax bill sent out about April 5, 1928, showed an assessed value of $941,000 and total tax due $46,955.90. Under section 35 of the Revenue act a board of review has power to increase the valuation placed by assessors on property described on the assessors' books. By section 37 that board is empowered to change the assessment, but where the board itself makes the assessment it is required to make a list of the property assessed, giving the value thereof. That board has no authority to assess a lump sum as value of all the property without description of its kind or character. (*People* v. *National Plate Glass Co.* 332 Ill. 599.) When an original assessment is made by the board it is required to proceed as an assessor would.

Counsel also argue that they, in fact, had no opportunity to be heard. Though notified to appear on December 15

the board made and entered the assessment on December 13. This was not a hearing as required by law. No attempt to procure the information necessary to comply with the law in making an original assessment is shown. Legal liability for taxes in case of an original assessment must be based upon notice, with an opportunity for a hearing of some description. We are unable to agree that a hearing was had in this case, as the matter had been foreclosed and the docket made up two days before that set for appearance of the objectors. This was, in effect, entering an original assessment in a lump sum without a hearing, which the board has no right to do. *Carney* v. *People,* 210 Ill. 434.

Counsel for appellant contend that if the assessment by the board of review is incorrect, relief against it could have been obtained in an action at law, and therefore a court of equity has no jurisdiction of this proceeding. Equitable jurisdiction is derived in this case from the questions hereinbefore considered. It is a familiar rule that equity, having taken jurisdiction, will grant relief in a proper case though in so doing legal remedies are administered. The assessment in the Roach case cannot be sustained.

Concerning the Hoopeston case, the record shows a complaint against "Warner Reciprocal Insurers, 155 E. Superior street, Lansing B. Warner, Inc. attorney in fact." This complaint shows "admitted assets $901,000 5% $45,059," "surplus $506,308" and the sum "$254,000" carried out, "board of review assessment on all personal property $45,100." On the back of the complaint is the notation, "Should be L. B. Warner, Inc.," and on the docket, page 141, is the notation, "Name as entered Warner Reciprocal Insurers should be L. B. Warner, Inc." This docket page showed a previous valuation by the board of assessors at $4598 and a valuation by the board of review of $254,000. A notice addressed to Warner Reciprocal Insurers, requiring the addressee to appear before the board of review on December 15, 1927, was received by Lansing B.

Warner, Inc., about December 12, but the record of the board of review shows that an assessed valuation of $254,-000 against "L. B. Warner, Inc." was fixed by the board on December 13, 1927. In this case, as in the other, counsel for the Warner Reciprocal Insurers appeared on December 15 objecting that they were not subject to the tax. The docket of the board of review shows that the assessment was made against "L. B. Warner, Inc., full amount $254,-000," "valuation board of assessors $4598," and total assessed "valuation board of review $254,000," on which a tax of $12,674.60 was extended. It is charged in the bill and admitted by the demurrer that Lansing B. Warner, Inc., filed its individual schedule of personal property owned by it, amounting to $4598; that that assessment had nothing to do with the Warner Reciprocal Insurers, but, notwithstanding this fact, the assessment was raised by the board of review to $254,000. This was conceded on the hearing, and the decree found that the sum of $4598 was assessed by the board of assessors against Lansing B. Warner, Inc., but no assessment on it was transmitted by the board of review to be extended, and it was agreed by the parties that such an assessment represented a tax of $232.44, which Lansing B. Warner, Inc., agreed to pay the collector on demand.

It is evident from this record of the board of review that no hearing was had prior to the assessment, and that the assessment was not made against Warner Reciprocal Insurers nor against Lansing B. Warner, Inc., as agent or attorney in fact of Warner Reciprocal Insurers, but against a purported corporation styled "L. B. Warner, Inc." Regardless of what effect, if any, may be given to this change of name, it is clear that no attempt was made by the board of review to change the values of the items shown in the records of the board of assessors to have been assessed by that board against "L. B. Warner, Inc.," or Lansing B. Warner, Inc. As we have seen in consideration of the

other case, section 37 of the Revenue act requires that when the board of review decides to reverse or modify the action of the board of assessors or change the assessment or description of any property in any manner it shall cause the changes to be made upon the assessment books and show by its records the items that have been re-valued and the values placed by it on such items. The board has no authority to assess a lump sum as the value of all property, without any description of its character. (*People* v. *National Plate Glass Co. supra; People* v. *Grant,* 271 Ill. 523; *Holt* v. *Hendee,* 248 id. 288; *Carney* v. *People, supra; Weber* v. *Baird,* 208 Ill. 209.) The record of the board in this case shows that it made no attempt to increase the value of items returned by the board of assessors as property belonging to "L. B. Warner, Inc.," or Lansing B. Warner, Inc. It is also apparent that the board of assessors assessed only the individual property of Lansing B. Warner, Inc. It was the duty of the board of review to show by its records what items were increased. The fact that its records do not so show, strongly indicates that the assessment made was an original assessment made in a lump sum, and as such cannot be said to be a valid assessment.

We are, for reasons herein stated, of the opinion that this exchange is required to list for taxation, as agent, all money and credits in its hands belonging to the subscribers, and that a tax thereon, under a proper proceeding, may be collected against it. The assessments here made, however, cannot be sustained under the proceedings shown to have taken place.

For the reasons given in this opinion, the decrees of the circuit court in these cases are affirmed.

*Decrees affirmed.*