(No. 24060.—■)
THE PEOPLE *ex rel.* Richard S. Wangelin, County Collector, Appellant, *vs.* THE CITY OF ST. LOUIS, Appellee.

*Opinion filed June 11, 1937—Rehearing denied October 12, 1937.*

Louis P. Zerweck, and Pope & Driemeyer, for appellant.

KRAMER, CAMPBELL, COSTELLO & WIECHERT, (EDGAR H. WAYMAN, and NORMAN J. GUNDLACH, of counsel,) for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

The city of St. Louis owns a bridge across the Mississippi river, connecting the city of St. Louis, Missouri, with the city of East St. Louis, Illinois. The bridge is known as the St. Louis Municipal Bridge and is located partly in each State. The board of assessors of St. Clair county, in 1933, assessed the part of the bridge in St. Clair county at $2,000,000 for that year. The city of St. Louis (hereafter called the City) filed a complaint with the board of review of the county and after a consideration thereof the latter body fixed the assessment at $3,000,000. Taxes of $161,028 were extended on that assessment. The City paid $53,676, the amount which would be due on an assessed valuation of $1,000,000. Application was made by the county collector to the county court for judgment on the unpaid amount of $107,352. The City filed objections to the taxes extended upon a valuation in excess of the amount on which it had voluntarily paid. The county court rendered judgment, sustaining the objections of the City to taxes extended upon a valuation of its bridge property in excess of $1,500,000, and denied the application of the county collector for judgment for the taxes upon a valuation in excess of that amount. From that judgment the People perfected this appeal and the City perfected a cross-appeal, questioning the validity of the taxes on an assessed valuation of the bridge property in excess of $1,000,000.

In compliance with the statute, the City deposited seventy-five per cent of the balance of $107,352 amounting to $80,514, under protest, and the remainder of the protested taxes amounting to $26,838 was neither paid

nor deposited. The substance of the objections filed by the City upon the application of the county collector for judgment, are: (1) That it has paid all of the taxes legally due from it on the bridge property (described by metes and bounds) for the year 1933; (2) after setting up court proceedings with respect to an injunction in 1931, and objections to taxes for the year 1932, wherein an assessed valuation in excess of $1,000,000 was held invalid, it was alleged that the judgments thereon are *res judicata* in this proceeding. The objections state that the board of assessors, after April 1, 1933, assessed the same property upon a valuation of $2,000,000, and the complaint heretofore mentioned was filed with the board of review alleging an excessive valuation; that upon a hearing that board increased the assessed valuation of the bridge to $3,000,000, which assessment was made after the decision of the court was rendered upon objections filed by the City to the taxes upon the property for the year 1932, which found that a valuation of $2,000,000 was excessive. The objections allege that there is a custom throughout the State of using an equalizing factor of thirty-seven per cent of the actual value of property for assessment purposes; that the value of the objector's bridge, located in Illinois, does not exceed the sum of $2,700,000, and that the assessment value of the bridge should not have been in excess of $999,000, though it is stated that the objector is willing to pay taxes upon an assessed valuation of $1,000,000, the amount at which the Illinois portion of the bridge had been assessed previous to the year 1931; that in assessing the objector's property on a valuation in excess of $1,000,000 the board of assessors and the board of review violated their own custom and discriminated against the objector, in contravention of section 1 of article 9 of the State constitution and the fourteenth amendment of the United States constitution, and placed an undue burden upon interstate

commerce, in violation of the constitution of the United States; that the assessment against the objector's property for the year 1933 is arbitrary, excessive, fraudulent and erroneous and should have been placed at the sum of $1,000,000, and that taxes based upon a valuation in excess thereof are illegal and void.

The principal questions presented by appellant on this review are: (1) What portion of the bridge is in Illinois and therefore taxable; (2) whether the court erred in not permitting an amendment of the description of the property to show the East St. Louis Union Station approach was included in the assessment; (3) whether the city of St. Louis sustained the burden of showing that the assessment of the bridge was fraudulent. The appellee's contentions are: (1) That the adjudications of the United States district court in the injunction proceeding in 1931, and of the county court of St. Clair county on objections to the taxes for the year 1932, are *res judicata;* (2) that the taxes on the assessment in excess of $1,000,000 are void; (3) that the court erred in not finding the equalization factor to be thirty-seven per cent instead of forty per cent. Certain rulings of the court on the admission and exclusion of evidence are also in question.

The boundary line between the States of Illinois and Missouri is the first question to be determined, in order to ascertain the portion of the bridge subject to taxation in St. Clair county. It was stipulated that the property of the City taxed in St. Clair county, described in the publication notice and delinquent list, is the same as that described by metes and bounds in the objections filed by the City. A great deal of testimony was offered upon the subject of the boundary line between the two States. The enabling act of Congress of April 18, 1818, (3 U. S. Stat. at Large, 428,) under which Illinois adopted a constitution, became a State and was admitted into the Union, made the middle of the Mississippi river the western

boundary of the State. (Ill. Ann. Stat. Const. p. 107.) The enabling act under which Missouri became a State, (3 U. S. Stat. at Large, p. 545,) made the middle of the main channel of the river the eastern boundary of that State. (*Iowa* v. *Illinois,* 147 U. S. 1.) In the year 1837, and previous thereto, there were two islands in the Mississippi river near St. Louis, and there were also two channels in the river. The main channel was much farther east than it now is. By reason of work done in the river, and possibly, in part, due to other causes, the channel or channels of the river have shifted from time to time. In 1837 Robert E. Lee, then a lieutenant in the corps of engineers of the United States army (afterward a general in the Civil War) was sent to St. Louis to ascertain what could be done to keep the main channel of the river along the St. Louis front. By the construction of dikes the current of the river was deflected and the purpose then in view was accomplished.

Evidence was offered on behalf of the appellee, much of which consisted of maps prepared from soundings and surveys made by engineers of the United States army in different years from 1837 to more recent times. According to one of the maps, and the testimony in support thereof, as well as other independent testimony, the deepest water in the river at the place where the bridge crosses is at a point 482 feet west of the center of pier number 4, the east-shore pier of the bridge. The bridge, consisting of three spans of about 668 feet each in length, rests upon four piers, numbered from west to east. Number 1 pier is the shore-pier on the Missouri side of the river, and, as stated, number 4 pier is on the opposite side, and about one-third of a mile from the east bank of the river as shown by one of the maps. Testimony on the question of the boundary, and other subjects, was presented on the previous hearings, heretofore mentioned, but it appears that the court reporter who then reported the testimony

was incapacitated at the time of the present hearing and oral testimony was presented on this hearing relative to the testimony which was heard on the previous hearing.

The testimony on behalf of the appellant with respect to the boundary consisted of the reference to the enabling act under which Illinois was admitted to the Union, and the testimony of captains and pilots who had been engaged in navigation on the river for many years, together with the fact that the center of the principal channel of navigation had been marked by lights in accordance with the regulations of the lighthouse service. From this testimony, because of the course taken by boats running up and down the river, it was deducible that the boundary line between the States where the bridge crosses was identical with the middle of the center span of the bridge.

The boundary line between States is well established to be the middle of the main channel of the stream. (*State of Minnesota* v. *State of Wisconsin,* 252 U. S. 273; *Iowa* v. *Illinois, supra*; *Buttenuth* v. *St. Louis Bridge Co.,* 123 Ill. 535.) International law today defines the river boundaries between States by the middle of the main channel, when there is one, and not by the center, half-way between the banks. (*New Jersey* v. *Delaware,* 291 U. S. 361; *Keokuk and Hamilton Bridge Co.* v. *Illinois,* 175 id. 626; *Iowa* v. *Illinois, supra.*) From the evidence it appears that much of the river is navigable. Boats are not confined by necessity to the center of the main channel or the center of the river, according to some of the testimony, and the center of the river, that is, the water half-way between the banks, was not necessarily the middle of the main channel or the deepest part of the river as also appeared from some of the testimony.

In addition to the independent testimony in this case adjudications upon an injunction proceeding and objections to taxes on this bridge for the years 1931 and 1932 stand in support of appellee's objections. The year 1931 was a

quadrennial year and a general assessment was required to be made. In the years 1931 and 1932 a determination of the boundary line was necessarily involved. It could not be determined what part of the bridge was assessable in Illinois if the boundary line was not determined. Though the judgment order may not have stated, in terms of feet, the location of the boundary line as being at a specified point on the bridge, witnesses, in testifying to the location of the boundary and the value of the bridge, based their estimates upon the location so fixed by the testimony in terms of feet, and that point was found to be at the same place the court, in the present proceeding, determined it to be. Parol evidence was admissible to prove the fact of the location of the boundary so determined. (*Harding Co.* v. *Harding,* 352 Ill. 417.) In the present case it was determined that about forty-two per cent of the bridge is in Illinois for tax purposes. In view of the testimony presented on this hearing, and of the previous decisions upon the boundary question, a contrary finding is not here justified. *Keokuk and Hamilton Bridge Co.* v. *People,* 185 Ill. 276.

The decision of the question as to the boundary line of the State at the bridge renders unnecessary a discussion of the contention that a certain highway map was improperly excluded. The evidence would have been cumulative, and the appellee has not been harmed by its exclusion. It is also unnecessary to notice appellee's alternative or secondary contention that if it is held that the boundary line was determined to be the middle of the river as it ran when the State was admitted to the Union, that line would be 1030 feet east of the center of the east-pier.

One of the errors assigned by the appellant was the refusal of the court to receive what it is contended was proper and competent evidence offered by the People for the purpose of proving that the board of review, in the

year 1933, actually assessed and included in the assessed valuation of the bridge property, that part of the structure called the East St. Louis Union Station approach; that, through error, the description was not corrected to include the specific description of that approach, and that such amendment should have been permitted by the county court. The People offered to prove by members of the board of review that the assessment as made by that body for the year 1933 was an assessment of all the property of the City comprised in the bridge proper and the approaches in St. Clair county. The county court, in passing upon the objections, did not include the East St. Louis Union Station approach as properly assessable on the record. The East St. Louis Union Station approach was constructed in 1929, though it was not entirely completed. This approach was never a part of any description of the bridge property assessed in previous years. As stated, the year 1931 was a quadrennial year in which all real property subject to taxation under the general revenue laws of the State, including real estate becoming taxable for the first time, should be listed and such assessment should be known as the general assessment, upon which taxes should be levied and extended during the quadrennial period for which the same is made. (State Bar Stat. 1935, chap. 120, par. 320, p. 2671.) Other provisions of the statute provide how additions or changes in property may be assessed in quadrennial and other years, and how corrections may be made in assessments. It is the duty of the assessors to list for taxation, as of the first day of April in each year, property to be assessed, and, between the first day of April and the first day of June in each year, list and assess in like manner all real property which shall become taxable and which is not upon the general assessment, and also to make and return a list of all new or added buildings, structures or other improvements of any kind, the value of which shall not have been previously added to or included in the valuation of the land

on which the improvement has been placed, the kind of improvement and the value of which has been added to the tract or lot by the erection thereof.

During the same period the assessor shall determine the amount of any change in the value of any tract or lots of land (also applicable to the bridge in question) by reason of any alteration in or addition to the improvements thereon since the first of April in the preceding year and prior to the first of April in the current year, and add to or deduct from the assessment accordingly, setting down the amount of such change in a proper column in the assessment books. State Bar Stat. 1935, chap. 120, par. 325, p. 2672.

By paragraph 346 of the Revenue act, (chap. 120, *supra,*) the board of review is required to assess all property which shall not have been assessed by the assessor, and it may of its own motion at any time before its revision of the assessment is completed in every year, increase, reduce or otherwise adjust the assessment of any individual or corporation on real or personal property, making changes in the valuation thereof as may be just, and shall have full power over the assessment of any individual or corporation, and may do anything in regard thereto that it may deem necessary to make a just assessment; but no assessment shall be increased until the person or corporation shall have been notified, and given an opportunity to be heard. Any change in the assessment is required to be noted on the assessment list as made by the assessors. Paragraph 348 provides that whenever the board of review decides to reverse or modify the action of the board of assessors or the assessment in any case, or the assessment or description of any property in any manner, they shall cause the changes to be made at once and entered upon the assessment books. State Bar Stat. 1935, pp. 2678, 2679, 2682.

The board of assessors and the board of review have only such authority as is given them by statute. (*People* v. *Board of Review,* 363 Ill. 106; *People* v. *Sheridan-Bromp-*

*ton Building Corp.* 331 id. 495; *People* v. *Keogh,* 306 id. 323.) If an original assessment was intended to be made by the board of review in the assessment of the East St. Louis Union Station approach it would be required to proceed as an assessor would. (*Roach & Co.* v. *Harding,* 348 Ill. 454.) To make a valid assessment of the bridge, or the bridge and approach, or the approach separately, (in the event that action under the circumstances shown in the record was proper) what the board of assessors or the board of review did with respect to such assessment could only be shown by its record. The board can only act by its record. (*People* v. *Chicago and Eastern Illinois Railway Co.* 326 Ill. 354; *Village of Bellwood* v. *Galt,* 321 id. 504; Revenue act, pars. 346, 348, *supra.*) The parol levy of taxes is not legally possible, but a record of the taxing body showing the levy or assessment of taxes must be kept. (*People* v. *Schlitz Transfer Co.* 333 Ill. 333.) A record which is the only source of evidence by which official action can be shown and which does not show any action shows that none was taken. (*Village of Bellwood* v. *Galt, supra.*) Where the law prescribes a certain method to be adopted to subject property to the burden of taxation that method must be substantially complied with before the property can be taken and sold in satisfaction of a tax. (*People* v. *Chicago and Illinois Midland Railway Co.* 260 Ill. 624.) The authority of the court to permit amendments in tax proceedings, in furtherance of justice and in order to make the record correspond to the facts, is probably not different from what it is to permit amendments in the exercise of its ordinary jurisdiction. But in matters so important to the State and to property owners, amendments should be allowed only upon clear proof of the truth of all the facts that are necessary to authorize the amendment. *Keokuk and Hamilton Bridge Co.* v. *People,* 161 Ill. 132.

The question presented here is not whether the bridge property, including the approach, could have been assessed

under paragraph 346 or other provisions of the Revenue act, but whether, on the record as it exists, corrections could be made and evidence heard to show that such assessment was in fact made, but through error no record was made of the action of the board of review to show not only an assessment of the bridge proper but of the East St. Louis Union Station approach. One of the members of the board testified that the bridge proper was assessed at $2,640,000. The remainder of the $3,000,000 assessment, ($360,000) on such a division would be for the approach in question. In support of the motion of the People to include the specific description of the approach mentioned, it is urged that a memorandum, written with a lead pencil, endorsed upon the complaint of the City, filed with the board of review by its clerk, is a proper basis for the correction. The memorandum is as follows: "Matter in court. Add 1,000,000 by reason of collection of tolls of $1,000,000 to 1 million and ½ & extension of east approaches to Br." By this memorandum the board recognized the fact that the matter of the assessment was in court, apparently at the time the memorandum was made. There is nothing in the memorandum to indicate the valuation of the East St. Louis Union Station approach, such as the member of the board testified was made. There was no record of the board of review showing the assessment, or any change in the assessment as made by the board of assessors, and the memorandum could not have been based upon or related to any record of the board of review. There was no offer to show that such a record was made, but the effort was to create a record from the oral testimony and the pencil memorandum.

Section 191 of the Revenue act provides that no error or informality in the proceedings of any of the officers connected with the assessment, levying or collection of taxes, not affecting the substantial justice of the tax itself, shall vitiate or in any manner affect the tax or the assessment

thereof. (State Bar Stat. 1935, p. 2647.) This rule applies only where there has been an attempt to comply with the law but the attempt is not effective on account of some informality or clerical error. (*People* v. *New York Central Railroad Co.* 314 Ill. 429.) When some required action on the part of the board has been omitted, such as the failure to have any record of its action whatever, an independent memorandum purporting to have been made after the assessment is in court, could not supply a basis for a new assessment or of a revised assessment of one fixed by the board of assessors. (*People* v. *Wabash Railway Co.* 316 Ill. 403.) There was no error in the exclusion of the testimony proffered by the respective members of the board of review to show that they made an assessment of the East St. Louis Union Station approach, and there was no error in the court's refusal to permit the amendment to be made. *People* v. *Illinois Central Railroad Co.* 314 Ill. 339.

We come next to the question whether the adjudications upon the objections to taxes in previous years on this same bridge property are *res judicata* as to the objections here as to the amount of the assessment, and if not, whether the City has sustained the burden of showing that the assessment of the bridge was fraudulent. On the question whether the previous assessments as finally made are binding as to the present assessment, it may be observed that a cause of action for the collection of taxes for one year is not necessarily the same as or identical with a cause of action for taxes for subsequent years. (*People* v. *University of Illinois,* 357 Ill. 369.) Bridge property is *sui generis.* It has no market value, and is not affected by the principles of supply and demand. Evidence of what it cost or what amount would be required to reconstruct it would not conclusively establish its real and actual value. It is property the value of which is largely determined by its location, its surroundings and the use that can be made and is made of it. (*Keokuk and Hamilton Bridge Co.* v. *People,* 161

Ill. 514; *People* v. *St. Louis Bridge Co.* 357 id. 245.) The earning power of a bridge is an important element in determining its actual value. (*People* v. *St. Louis Merchants Bridge Co.* 291 Ill. 95; *People* v. *St. Louis Bridge Co. supra.*) There is nothing in the record to indicate that it may not have been assumed when the previous assessments were made that the upper deck of the bridge, which was then used free of charge, would continue to remain free to the use of the public for the quadrennial period. The bridge is sometimes referred to as "the free bridge." The evidence shows that the highway deck was opened to travel in 1917, but traffic over the railway deck did not commence until 1930; that since that time revenue from the lower deck has been increasing, and would increase by the connection with railroads when and as afforded by the East St. Louis Union Station approach. Tolls were not charged for the use of the upper deck prior to July 21, 1932, but from that time tolls at the rate of ten cents for pleasure automobiles and fifteen cents for commercial vehicles were charged. The gross revenue therefrom to April 10, 1933, was $637,470.65. The charge of tolls for the upper deck was instituted by the city of St. Louis, pursuant to ordinance, to pay bonds and interest authorized to increase finances for the relief of the poor of that city, and was apparently intended to be for a limited period. It might, therefore, not be proper to capitalize the earnings created in this manner the same as average earnings might be capitalized for the life of the bridge. The receipts, however, created an element of earning power which added to the value of the bridge. The City's complaint before the board of review in 1933 sought a reduction of the $2,000,000 valuation by the board of assessors for that year. This was not allowed but instead the board of review attempted to increase the amount to $3,000,000, but the board of review did not proceed in accordance with the statute and that action was a nullity. The result was that the valua-

tion was left at $2,000,000 as fixed by the board of assessors. One of the important questions is whether the county court is bound by its decision rendered in 1932, or whether, on the present hearing, it might reconsider the question because of increased value by reason of the collection of tolls previous to the adjudication upon the objections. We are of the opinion that the county court, upon the hearing in 1933, had a right to take into consideration such additional fact. Where a former decision is relied upon as a bar to a subsequent action it is essential there be identity of subject matter and cause of action. The conditions here were different from those existing in 1931 and 1932, and the county court, in 1933, was bound neither by the decision in 1931 nor that in 1932. *People* v. *University of Illinois, supra.*

Upon the question of the valuation of the bridge to ascertain whether the assessment was excessive and constructively fraudulent, an additional description of the bridge, a statement of its cost and reference to evidence of its reproduction cost and earning capacity, will aid in the consideration of that issue. The bridge is a double-deck structure, the lower deck of which, as stated, is used for railroad purposes and the upper deck for highway purposes. The total length of the railway deck is approximately three and one-half miles, and the highway deck is about one and eight-tenths miles in length. The total length of the river span is about 2022 feet. The total original cost of the bridge structure and its approaches (excluding land values, the tax on which has been paid) was, according to the testimony of one witness, $6,827,459, or, as testified by another witness, a little in excess thereof. Subsequent to the year 1929, and previous to April 1, 1933, $963,636 was expended for the construction of the additional railroad approach in East St. Louis, known as the East St. Louis Union Station approach, but which at that time was incomplete. Evidence was offered of the reproduction cost of the entire

structure as of April 1, 1933, exclusive of the right of way. One witness placed the cost at $7,773,914, or with depreciation (based on an allowance sometimes used in interstate commerce proceedings) the reproduction cost would be $5,924,409. The figures testified to by another witness were, cost, new, $7,447,513; reproduction cost, depreciated, $5,684,077. The estimate of a third witness was, cost, new, $8,853,438; depreciated value, $7,296,856. One of these witnesses based his testimony upon the assumption that the boundary line of the State was as previously decided, and placed the original cost of the portion of the bridge in Illinois, exclusive of the right of way, at $2,959,954, or less depreciation, $2,216,414, and applying the equalization factor of thirty-seven or forty per cent of actual value, the assessed valuation would be $820,073, using the lesser factor, or $886,565, using the greater factor. Upon somewhat similar amounts, testified to by another witness, the assessed valuation of the bridge would be less than $1,000,000 for that part assessable in Illinois. Without setting out the separate specific figures as shown in the testimony, but using the same factors to arrive at the assessed valuation, if the center of the middle span is assumed to be the middle of the river, and is taken as the true boundary line between the States, the assessed value of the bridge in Illinois would exceed $1,000,000. An estimate by a witness for the People was considerably higher than the figures above shown as the reproduction cost less depreciated value, if the boundary line was assumed to be the center of the middle span of the bridge.

The methods of estimating the value of the bridge by capitalizing income are different, as shown by a comparison of the testimony for the People with that of witnesses for the City. The result, however, may, in a general way, be shown by illustration. There was evidence on behalf of the City that the valuation of the part of the bridge in Illinois, that is, forty-two per cent, based upon the gross

income for the year ending April, 1933, capitalizing the full value of the bridge on the basis of fifteen per cent of the gross income allocated to Illinois, the reproduction cost of the bridge in this State, less depreciation, would be $1,941,533. The equalization factor used by the City's witnesses was thirty-seven per cent of actual value, but applying the forty per cent factor, the assessed value of the portion of the bridge in Illinois, as estimated by one witness, would amount to $736,320. Evidence was offered on behalf of the People as to the value of the bridge based upon the gross and net income for the fiscal year 1932-33, capitalized at various rates. The net income was calculated to be $609,174.10, which, capitalized at six per cent, would produce a valuation of $10,152,900, the valuation of which for the part of the bridge in Illinois of sixty-three per cent plus, contended for by the People, would be $6,461,812, and if forty-two per cent of the bridge is in Illinois, as contended by the City, the amount would be $4,264,218. Using forty per cent as the equalizing factor, applied to the latter amount the assessable valuation of the portion of the bridge in Illinois would be $1,705,687.20.

As is apparent from the foregoing figures and illustrations of method of arriving at the assessed valuation of the bridge property in Illinois there was a difference of opinion among the witnesses. A comparison of this bridge with privately owned structures of a similar character in an effort to arrive at a just assessment might not afford a true criterion of value because of a difference in the use and benefit derived from the structures. Manifestly, the element of revenue would have a tendency to enhance the value of privately owned bridge structures above one municipally owned, which provided free traffic over one entire deck. Receipts from tolls from the upper deck of the bridge might not have entered into the calculations of the board of assessors in making assessments for the years 1931 and 1932, for there were no receipts in those years.

Such receipts, however, constituted a proper element in the valuation by the board of review of the bridge for the year 1933. Though such earnings might not be of a permanent character the bridge might well be given a different valuation for the year 1933 than it had been given for the year 1931 and 1932 and previous thereto. Taking into consideration the earnings from the upper deck of the bridge between July 21, 1932, and April 10, 1933, of $637,460.65, in connection with the cost of the bridge, and estimated reproduction cost, less allowable depreciation, and the fact that only forty-two per cent of the bridge is properly assessable in Illinois, instead of sixty-three or sixty-five per cent upon which the assessment by the board of review is based, the value would more nearly approximate $2,000,000 than in 1932, when the matter was before the county court on previous hearing. Even if this last valuation is excessive, if any element of valuation above $1,000,000 is confined to such receipt of tolls, some amount above $1,000,000 was justified. Within the original valuation of $2,000,000 as fixed by the board of assessors there was no necessity for a record by the board of review, because within that amount there was no change or modification. The county court, however, held that the assessment upon a valuation of $1,500,000, only, was justified. While the county court, in its previous judgment, permitted the collection of taxes only on a valuation of $1,000,000, the valuation on the books of the assessor was shown as $2,000,000 as made by that body continuously from 1931. This leaves for consideration the question whether the finding of the county court in 1932, permitting a tax only upon a valuation of $1,000,000, is a final adjudication and is *res judicata*, or whether, upon an attempt to collect taxes for the year 1933, the court may consider changed conditions and reconsider the valuation as and for the year 1933. We are of the opinion that the finding of the county court that the taxes for the years 1931 and 1932 should be based upon a valua-

tion of $1,000,000, does not preclude the court from considering increases in value of the property arising since the objections to the 1931 and 1932 taxes were considered. The county court had the right to consider the question of tolls collected by the city of St. Louis in arriving at a valuation, within the $2,000,000 limit of valuation as shown on the records of the board of assessors and upon which the board of review acted, and was not bound by the previous decisions of the court. The former decisions were binding only in the respects heretofore mentioned. (*People* v. *University of Illinois, supra; Chicago Theological Seminary* v. *People*, 189 Ill. 439.) There was no change in the physical property itself by reason of the tolls and therefore a re-assessment as provided by statute was not necessary. The increase in value was by reason of an additional use not present when the county court had under consideration the value at a prior proceeding. The assessment remained at all times during the quadrennial period starting in 1931, but the value increased until its value more nearly reached the $2,000,000 valuation. The record discloses that the parties agreed to abide by the value of the bridge as fixed by the county court in 1932. By stipulation entered into between them it was agreed that this value as found should be entered by the United States circuit court in proceedings to enjoin the collection of taxes for the year 1931. This amount was $1,000,000, and it did not take the tolls into consideration. The difference between that amount and the sum of $2,000,000, as assessed in 1933, presumably was based upon the value of the bridge as increased by the tolls. The county court, however, found this amount to be excessive and fixed the increased value at one-half that amount or $500,000. The objector voluntarily paid its taxes upon a valuation of $1,000,000. The county court's action was not arbitrary or contrary to law in overruling objections upon an additional valuation of $500,000. The court did not err in refusing judgment for taxes upon a valuation in excess of $1,500,000.

It is contended that the court erred in not finding the equalization factor to be thirty-seven per cent instead of forty per cent of the actual value of the bridge in arriving at the proper assessed value of the property in question. A ratio of not to exceed forty per cent of the fair cash market value of bridge property, adopted by the taxing authorities of St. Clair county, was recently recognized as proper by this court. *People* v. *Gillespie,* 358 Ill. 40; *People* v. *St. Louis Bridge Co. supra.*

The judgment of the county court is affirmed.

*Judgment affirmed.*