(No. 21385.—

THE CHARLES E. HARDING COMPANY, *vs.* CHARLES E. HARDING *ct al.* Plaintiffs in Error.—(ERWIN J. FELDES *et al.* Defendants in Error.)

*Opinion filed April 22, 1933—Rehearing denied June 7, 1933.*

Justus Chancellor, and Justus Chancellor, Jr., for plaintiffs in error.

Sidney C. Murray, Marvin A. Jersild, and Harold E. Christensen, for defendants in error.

Mr. Justice Dunn delivered the opinion of the court:

A writ of *certiorari* in this case brings before us for review a judgment of the Appellate Court for the First District which reversed a decree of the circuit court of Cook county granting relief to Charles E. Harding upon his cross-bill against Erwin J. Feldes, James B. Nelson, John W. Sener, Walfred Davis, and others, by setting aside an agreement entered into on April 4, 1922, between the defendants named and Charles E. Harding, and declaring

that the shares of capital stock of the Charles E. Harding Company held by any of defendants to the cross-bill belonged of right to Harding, subject to an accounting, which was decreed between Harding and such defendants, of money advanced to Harding or on account of the business of the Charles E. Harding Company, less such sum, if any, as might be found due on such accounting from the defendants to Harding. The decree also dismissed the amended bill of complaint for want of equity. The Appellate Court, on reversing the decree, remanded the cause to the circuit court, with directions to dismiss the cross-bill and enter a decree in accordance with the prayer of the amended bill of complaint.

The original bill was filed by the Charles E. Harding Company on July 22, 1924, against Charles E. Harding, the Stockmen's Trust and Savings Bank and Margaret McDermott. Harding answered the bill on September 6 and the bank on September 8. Exceptions were sustained to Harding's answer, and an amended bill was filed on March 2, 1925, by the complainant, in behalf of itself and all other creditors of Harding similarly situated who should come in and contribute to the expenses of the suit. The amended bill was a creditor's bill against Harding, which alleged the recovery of a decree against him and Raymond Roe (also known as Raymond Harding and as Charles E. Harding, Jr.,) in the superior court of Cook county for $891.90, costs of suit, the issue of an execution and its return no property found. It alleged that there was due on the decree $798.40, and alleged that Harding was further indebted to the complainant in the sum of $20,000, balance due for advancements made under an agreement between Harding and the complainant; that it had been determined by a court having jurisdiction of the parties and the subject matter that the complainant had complied with the terms of that agreement and advanced all money required by the agreement to be advanced by it, and the court had

also decided that the property delivered in trust under the terms of the agreement was not of sufficient value to pay the complainant; that the defendant was at the date of the decree, April 28, 1924, insolvent, and the decree is now in full force and effect, not appealed from and no writ of error has been sued out to reverse it. Margaret McDermott, as executrix of the last will and testament of Timothy C. McDermott, was made a defendant as the owner of a judgment recovered by her in the municipal court of Chicago against Harding for $1279.35 and costs, upon which an execution had been issued and returned no property found. It was alleged that the plaintiff in that judgment had sued out a writ of garnishment against the Stockmen's Trust and Savings Bank. The bill further alleged that Harding was the owner or was interested in certain of the capital stock of the Charles E. Harding Company, the complainant, a corporation, which was not subject to levy under execution by reason of the fact that Harding had pledged it as collateral security for a loan to the Stockmen's Trust and Savings Bank. It was further alleged that Margaret McDermott, as executrix, claims that as a judgment creditor she is entitled, by reason of her garnishment suit, to a lien on the capital stock in the possession of the bank prior to the lien of the complainant. The prayer of the bill is that the defendants be required to answer, and that they, or some of them, be decreed to pay to the complainant the amount due to it on its decree, for an injunction, for a receiver and for general relief.

Harding filed an answer on April 1, 1925, and also a cross-bill, making defendants all the parties to the original bill, together with John W. Sener, Erwin J. Feldes, James B. Nelson and Walfred Davis.

The first litigation between the Charles E. Harding Company and Charles E. Harding was begun by the filing of a bill for an injunction by the Charles E. Harding Company in the superior court of Cook county against Harding and

Raymond Roe (otherwise known as Raymond Harding and also as Charles E. Harding, Jr.,) to restrain them from using the Harding name in the livestock business in Chicago. This bill resulted in the rendition of a decree against the defendants on April 28, 1924, restraining such use of the Harding name and decreeing costs against the defendants. This is the decree for costs which is the basis of the creditor's bill in this case. Harding's answer to the bill in the present case was that the decree rendered by the superior court of Cook county on April 28, 1924, was obtained by fraud and circumvention and is void and of no effect, and should be so held by this court in this proceeding for the reasons appearing on the face of the amended bill of complaint and the agreement thereto attached and the facts and circumstances set forth in the answer. The answer sets forth in great detail that the complainant corporation was formed pursuant to an agreement between the answering defendant and Feldes, Nelson, Davis and Sener, the other stockholders, for the purpose of incorporating the business of Harding which he had theretofore carried on as an individual. The agreement contemplated that Harding should turn over all his business assets to the proposed corporation and deliver all of his real estate and personal property to a trustee for the benefit of the corporation or of persons who had advanced money toward payment of the business indebtedness.

The bill in the injunction suit alleged that for twenty-five years prior to April 22, 1922, Charles E. Harding had been engaged, under the name of Charles E. Harding & Co., in the business of buying and selling, on commission, livestock in the Union Stock Yards and Transit Company in Chicago, and the names "Charles E. Harding," "Charles E. Harding & Co.," "C. E. Harding" and "Harding" became well and widely known among dealers and persons engaged in selling livestock, in practically all of the States of the United States; that at one time during this time Harding

had failed in business, several times had become seriously embarrassed financially, and once had been suspended from the Chicago Live Stock Exchange; that he again became embarrassed, so that between April 4 and 29, 1922, he was insolvent to such an extent that checks issued by him and outstanding between those dates amounted to $32,111.02 with less than $5000 available to pay them when presented, and in addition he owed other accounts in his business amounting to $9000 which he was unable to pay, and he did not have assets which, if liquidated, would have paid his checks and other claims in full; that when the bill was filed Harding was indebted in sums largely in excess of his assets and hopelessly and irretrievably insolvent; that Raymond Roe, who was interested in the business with Harding and is sometimes known as Charles E. Harding, Jr., was a person of very small means and indebted much more than his assets and was hopelessly and irretrievably insolvent. The bill also alleged that on April 4, 1922, Harding entered into an agreement in writing with Erwin J. Feldes, Walfred Davis, James B. Nelson and John W. Sener, pursuant to the terms of which the complainant was incorporated, and in consideration of such incorporation and of the delivery to him of one hundred shares of the capital stock of the complainant, and in consideration of a contract of employment entered into on April 29, 1922, pursuant to the contract of April 4, whereby he was employed by the corporation for two years at an annual salary of $6500, Harding sold, transferred and assigned to the corporation all of the assets, including the good will, of the livestock commission business then being conducted by him and agreed that the corporation during its life should have the sole and exclusive use of the name "Charles E. Harding," and thereby the corporation became entitled to the sole use of said name in the livestock commission business within the limits of the property of the Union Stock Yards and Transit Company so long as the corporation should re-

main in business; that Harding then became a stockholder, director and vice-president of the corporation and was such at the time of filing the bill; that under this contract Harding deposited certain deeds and stock with Joseph Graber as trustee, the net value of which was less than $15,000; that the corporation paid net business liabilities of Harding amounting to more than $37,000, and there was due from Harding to the corporation under the contract more than $26,000. The bill then proceeded to allege acts by Harding while employed by the corporation which were considered as disloyal to the corporation, his discharge from employment, his entry thereafter with his foster son, Charles E. Harding, Jr., into the livestock commission business under the name "Charles E. Harding & Son," and their prosecution of that business in such manner as to bring confusion and loss to the corporation in its business.

The defendants answered that in the spring of 1922 Charles E. Harding had outstanding obligations amounting to approximately $32,000 which he was unable to pay in cash, but that he had assets consisting of real estate in Chicago, Texas and Virginia, and other assets, the total value of which, conservatively estimated, was $75,000, which he turned over to a trustee to secure his indebtedness, and that the trustee sold and disposed of certain of the assets and held the remainder for the purposes set forth in the trust agreement with Harding. The answer denied that Harding was insolvent between April 4 and 29, 1922, or at any other time, or that he or Charles E. Harding, Jr., was insolvent at the time of the filing of the bill. It admitted that on April 4, 1922, Harding entered into the contract, the corporation was formed and he assigned to it all the assets of his livestock commission business in consideration of the organization of the corporation and the delivery to him of one hundred shares of its capital stock, but denied that there was any contract of employment entered into between the corporation and Harding, or that Harding then,

or at any time, agreed with the corporation that it should have the sole and exclusive use of the name "Charles E. Harding," or that Harding could not in equity and fairness use his own name in the livestock commission business. The answer contained further allegations and denials but did not in any way question the existence or validity of the contract of April 4, 1922, though it denied the existence of the contract of employment as alleged in the bill of complaint.

Upon the hearing of this cause upon the issues made by the bill and answer the court found, in accordance with the allegations of the bill, that the contract was entered into on April 4, 1922, and that the subsequent events occurred in pursuance of its terms; the organization of the corporation; the transfer to it of Harding's livestock commission business assets, including the good will; the payment of Harding's business obligations by the corporation; the creation of the trust covering other assets of Harding; the issue of one hundred shares of the capital stock of the corporation to Harding and his becoming a director of the corporation, and that thereby Harding was forever stopped from using the name "Charles E. Harding" in any manner whatsoever connected with the livestock commission business in the Union Stock Yards in Chicago. The court further found that Harding and the corporation did enter into the contract of employment as alleged.

It is manifest that in the injunction suit there was no issue between the corporation and Harding as to the existence of a contract between them but only as to its terms and legal effect. Both the bill and answer alleged the existence of a contract for the organization of the corporation and the transfer of the business of Harding to it, but the answer denied the existence of the contract of employment of Harding and also disputed the construction of the contract but not its validity or binding force. If the contract had been invalid for fraud or duress in its origin that issue

might well have been raised and decided in that suit, but no such question was raised in the pleadings, and naturally no such question was mentioned, considered or determined in the decree.

The amended bill in this case (a creditor's bill) was based upon the decree in the injunction suit as the origin of the obligation resting upon Harding to pay the costs incurred in that suit, and upon the contract of April 4, 1922, as a basis for the further claim of $20,000 as the amount due to the corporation under that contract. Harding was the principal party defendant, the Stockmen's Trust and Savings Bank and Margaret McDermott, as executrix of the will of Timothy C. McDermott, being made defendants as creditors of Harding claiming liens on his stock in the corporation. In the injunction suit the corporation and Harding were the real parties in interest. So they were in the original bill in the present suit, but the principal defendants against whom the cross-bill in this suit was directed were Feldes, Sener, Davis and Nelson, who constituted, with Harding, the stockholders of the corporation. This cross-bill is voluminous in its charges of fraudulent purpose, bad faith and evil intent on the part of the other four stockholders except Harding, and it alleges that Feldes, having the trust and confidence of Harding, formed a plan to secure Harding's business and property for himself and others who thereafter confederated with him and assisted him in obtaining from Harding his property and business, such other persons being the plaintiffs in error, Nelson, Ernest J. A. Gold, president of the Stockmen's Trust and Savings Bank, F. B. Stafford, president of the Chicago Live Stock Exchange, and Joseph A. Graber.

The ultimate question which the plaintiffs in error present in this case is: Was Harding induced to enter into the contract of April 4, 1922, by the fraud of the other four parties to that contract? That he was is the ground of his complaint, without which his cross-bill has no founda-

tion. The defendants in error contend that this question was adjudicated by the decree in the injunction case, and if it was, that is the end of the matter, for while the defendants in error were not formally joined as parties to the bill they prosecuted the case as officers of the corporation, and the case was really a controversy about the affairs of the corporation between Harding on the one hand and the other four stockholders on the other.

The doctrine of *res judicata* is, that a cause of action finally determined between the parties on the merits, by a court of competent jurisdiction, cannot again be litigated by new proceedings before the same or any other tribunal, except as the judgment or decree may be brought before a court of appellate jurisdiction for review in the manner provided by law. A judgment or decree so rendered is a complete bar to any subsequent action on the same claim or cause of action, between the same parties or those in privity with them. The doctrine extends not only to the questions actually decided but to all grounds of recovery or defense which might have been presented. (*Wright* v. *Griffey,* 147 Ill. 496; *Markley* v. *People,* 171 id. 260; *Terre Haute and Indianapolis Railroad Co.* v. *Peoria and Pekin Union Railway Co.* 182 id. 501; *Harvey* v. *Aurora and Geneva Railway Co.* 186 id. 283; *Godschalck* v. *Weber,* 247 id. 269; *People* v. *Harrison,* 253 id. 625.) Where the former adjudication is relied on as an absolute bar to a subsequent action, it must be shown that the cause of action, the thing to be recovered and the parties are the same in both proceedings. The principle of *res judicata* applies, however, to cases where, although the cause of action is not the same, some fact or question has been determined and adjudicated in a former suit and the same fact or question is again put in issue in a subsequent suit between the same parties. In such cases the determination in the former suit of the fact or question, if properly presented and relied on, will be held conclusive on the parties in the later

suit, regardless of the identity of the cause of action, or the lack of it, in the two suits. When the second action between the same parties is upon a different cause of action, claim or demand, it is well settled that the judgment in the first suit operates as an estoppel only as to the point or question actually litigated and determined and not as to other matters which might have been litigated and determined. In such cases the inquiry must always be as to the point or question actually litigated and determined in the original action, the burden of proof is on him who invokes the estoppel, and extrinsic and parol evidence is admissible to prove that the precise question in the second case was raised and determined in the first. (*City of Chicago* v. *Cameron,* 120 Ill. 447; *Wright* v. *Griffey, supra; Hanna* v. *Read,* 102 Ill. 596; *Sawyer* v. *Nelson,* 160 id. 629; *Young* v. *People,* 171 id. 299; *Stone* v. *Salisbury,* 209 id. 56.) This principle is sometimes called estoppel by verdict, and the estoppel is equally available to either party, the plaintiff in support of his action or the defendant of his defense, when the circumstances warrant it. Whether the adjudication relied on as an estoppel goes to a single question or all the questions involved in the case, the fundamental principle upon which it is allowed is that justice and public policy alike demand that a matter, whether consisting of one or many questions, which has been solemnly adjudicated in a court of competent jurisdiction shall be deemed finally and conclusively settled in any subsequent litigation between the same parties where the same question or questions arise, except where the litigation is a direct proceeding for the purpose of reversing or setting aside such adjudication. *Markley* v. *People, supra; Hanna* v. *Read, supra; Tilley* v. *Bridges,* 105 Ill. 336; *Potter* v. *Clapp,* 203 id. 592; *Merrifield* v. *Canal Comrs.* 212 id. 456; *City of Chicago* v. *Partridge,* 248 id. 442; *Chicago Terminal Railroad Co.* v. *Barrett,* 252 id. 86; *Healea* v. *Verne,* 343 id. 325.

The cause of action set out in the injunction bill was the breach of the contract of April 29, 1922, whereby Harding was alleged to have agreed that the corporation during its lifetime should have the sole and exclusive use of the name "Charles E. Harding" in the livestock commission business within the limits of the Union Stock Yards and Transit Company so long as the corporation should remain in business. No other relief was asked than the injunction. While the preliminary facts leading up to the execution of that contract were alleged, these facts were not made the basis of any prayer for relief, no issue was taken on them by the answer, and they were not made the ground of any relief granted by the decree. There was no issue of fraud in the injunction case, no consideration by the chancellor, in the disposition of the case, of the question of fraud, and no finding in the decree on that question. Harding is not precluded by the decree in the injunction case from availing himself of any defense of fraud to which he may be entitled under his cross-bill.

In its consideration of the case the Appellate Court arrived at the conclusion that the validity of the agreement of April 4, 1922, had, or should have, been litigated and determined in the injunction suit, and therefore the issues of duress, constructive fraud and overreaching of the plaintiff in error, Harding, were *res judicata* and not open to controversy in the present suit. Therefore it did not consider the assignments of error upon those issues but reversed the decree and remanded the cause, with directions to dismiss the cross-bill for want of equity and to render a decree in accordance with the prayer of the amended bill.

Since we have held that the decree in the injunction suit was not conclusive of the issues presented to the circuit court in the present suit, a proper determination of those issues requires us to examine the facts as they appear in the record. These facts are disclosed by the testimony of witnesses and the exhibits contained in the tran-

script of nearly three thousand pages, the contents of which the plaintiffs in error have purported to present to the court in an abstract of thirty-three pages. The abstract filed by the petitioners was wholly insufficient to present the case on the record, but its deficiencies were supplied by a full abstract of the entire record filed by the defendants in error. We do not regard it as necessary to enter into a detailed discussion of the testimony of each witness but deem it sufficient to state the material facts as they are disclosed by the testimony of the witnesses and the documentary evidence.

Harding was born in 1862 and in 1922 had been engaged in the livestock commission business over thirty-five years, most of the time in the Union Stock Yards in Chicago, though in the earlier part of his career he was also engaged in that business in St. Louis for a number of years under the firm name of Godair, Harding & Co. About 1900 he took the Chicago business and his partners the St. Louis business. After that he conducted the livestock commission business in the Union Stock Yards in Chicago under the name of Charles E. Harding & Co. Most of the persons doing a livestock commission business in Chicago are members of the Chicago Live Stock Exchange and are subject to its rules. The rules of the exchange provide that payment for all purchases of livestock is due on the day of purchase, and, if payment on that day is impossible, all checks for such payments are required to be available not later than eleven o'clock on the following morning. Harding did most of his banking business with the Stockmen's Trust and Savings Bank, of which Ernest J. A. Gold, who was one of the defendants to the cross-bill, was president. The custom of the banks doing business in the yards is to have a balance taken twice a day—one at the close of the day's business and the other in the morning after the checks presented through the clearing house have been paid and before customers have made their deposits for that day. If

there is an overdraft at the close of the day's business it shows on the books of the bank. Where stock has been purchased from out-of-town customers and checks have been given for the price without having a balance in the bank sufficient to pay all checks drawn, there is an actual overdraft though it will not appear on the books until the checks are actually presented. If the checks from the day's sales cleared the next morning are sufficient to cover the overdraft it will not appear on the books as an ovedraft on either day. It is the practice, if such an overdraft is made, to require an over-night note of the depositor to cover the amount of the overdraft. This practice depended entirely on the customer's credit standing with the bank, which might at any time demand security against his overdrawing his account.

In 1915 Harding was suspended from the Chicago Live Stock Exchange, of which he was a member, because of his inability to pay customers for stock shipped, and he went to Texas, where he remained for two or three years and then returned to Chicago. He was reinstated by the exchange and again engaged in the livestock commission business. In March, 1922, he had again become embarrassed financially for lack of money to meet promptly his engagements to shippers. At that time he had in his employ Erwin J. Feldes, who was a stenographer and advertising man, who had been in his employ since 1920. Before that time Harding had no personal dealings with him. He was employed as a stenographer, used to go out on the road, and gradually worked into looking after the business generally. He was an advertising man, wrote circulars and letters, had charge of the files and helped to sell cattle. He was not a book-keeper and made no entries in the books. He had no authority to sign checks. McCann, the cashier, had authority to sign and indorse checks, and no one else, except Harding himself, had such authority. McCann left in 1919 or 1920 and Teeling became cashier,

and while he was there he had authority to sign and indorse checks. In 1921 he was succeeded as cashier by Cook, who had been assistant cashier. Cook then was given authority to sign checks. Nelson, Sener and Davis, who were all defendants to the cross-bill, were also employees of Harding but had nothing to do with the business in the office. Nelson was a cattle salesman, Sener was Harding's assistant in the yards, and Davis was a butcher-stock salesman. There is no evidence that either of these men had any particular knowledge of the general conditions of Harding's business. Though these four men are charged in the cross-bill with having entered into a conspiracy, while they were in Harding's employ, to defraud him of his business and obtain it for themselves, and it is further charged that they induced him, by false and fraudulent representations as to the condition of affairs, to enter into the agreement of April 4, 1922, which resulted in the formation of the Charles E. Harding Company, Inc., yet, so far as Sener and Davis are concerned, there is no evidence whatever of any representations made by either of them to Harding as an inducement to enter into that agreement.

The personal relations between Feldes and Harding were very friendly, and the evidence shows that several times Feldes had helped Harding in negotiations for loans for particular purposes. Early in 1922 Harding's dealings with the bank were such that he had reason to fear that the bank might not continue to honor his checks unless he would put into the business additional capital to give assurance to the bank that his balance would be maintained and that there would be no overdrafts. Early in March, Harding asked Feldes to see what he could do toward raising money for the business, and also asked Nelson for help. He had tried to raise money on his own resources and had sought a loan on land in Texas which he owned but had been unable to raise enough to be of any considerable assistance. Feldes and Nelson saw a number of persons, as well as Harding,

but were unsuccessful in raising the money. Harding then suggested that Feldes and Nelson see Stafford, the president of the Chicago Live Stock Exchange, disclose the condition of Harding's business to him and try to get his aid. Nelson, pursuant to this request, saw Stafford and told him the facts as to Harding's condition. This condition was that Harding's books showed overdrafts upon dates in December, 1921, and January, February and March, 1922, ranging from $16,000 to $32,000. Stafford insisted that this condition could not be tolerated, and, since it had been brought to his attention, if something were not done to rectify it he would have to present the matter to the directors of the exchange. He suggested that the situation should be taken up with the bank, and that Gold, the president of the bank, be communicated with. This interview was reported to Harding. He was told he would have to do something to meet the situation. Feldes and Nelson then presented the matter to Gold, and Gold told them that he would not carry the Harding account along and pay possible overdrafts unless something was done to put the business on a sound financial footing and under safe management. Harding had been urgently asking the aid of Feldes and Nelson and said that whatever they did to raise the money would be all right. Nelson then called Feldes, Sener and Davis together and told them they would have to raise the money to save Harding from failure. The amount, they all agreed, which was necessary to save Harding from failure was $25,000, but finally it was determined, and Gold indicated, that he would be satisfied to continue to pay their checks if the sum of $15,000 could be assured. Merrill Johns was expected at first to join with Feldes, Nelson and Sener to raise the money, but in the end he declined and Davis went in as one of the four to raise the $15,000. Harding, Feldes and Nelson repeatedly talked the whole matter over, and the evidence does not show any attempt made by either Feldes, Nelson, Sener or Davis to misrep-

resent or hide any fact from Harding. In fact, Harding knew all about the details of his business. He kept himself informed about them, visited the office, had reports made frequently, which he examined, and realized the condition of his affairs, the dubious nature of his credit with the bank and the necessity of having more capital in his business to maintain his credit. The defendants in error could tell him nothing which he did not know. He understood thoroughly the rules of the exchange, the methods of the bank, the necessity of maintaining a cash balance sufficient to assure funds to meet his checks and the insufficiency of his cash resources for that purpose. It appears that in 1921 and the first four months of 1922 he withdrew from the business for his personal account over $30,000. Early in 1922 the Federal government was investigating the livestock commission business under the authority of the Packers and Stock Yards act, and it was thought the books of the firms engaged in the business might be audited and bonds required of them to guarantee payments to shippers. Harding was shown to be much concerned about this investigation for fear it might result in the requirement of such a bond and he might not be able to give it.

The result of all the conversations among all those interested was that a conference was held at the Stockmen's Trust and Savings Bank on Saturday afternoon and evening, April 1, 1922, of Harding, Stafford, Gold, Feldes, Nelson and Sener. A general discussion of the business occurred, lasting until about 8:30. Stafford then left the meeting, saying the matter would have to be fixed up in some manner or he would report Harding to the Chicago Live Stock Exchange on Monday. The others remained there, discussing the matter until midnight. Gold told Harding that the bank could not go along with him any longer, and that if money was not in the bank Monday morning Harding's checks would not be paid. The next day, Sunday, April 2, 1922, Harding met with Nelson,

Feldes, Sener and Davis at Harding's office and they went together to the bank, where they met Gold and some of the members of the finance committee of the bank and the attorney for the bank. At Harding's office there was some discussion between Harding and the four defendants as to what interest Harding should be allowed under the new arrangement, if it should be successfully brought about. When they arrived at the bank in the afternoon there was a further discussion of the matter, and a preliminary draft of the proposed contract between Harding and the four defendants was prepared. Gold indicated at this meeting that in addition to the requirement that additional money be furnished he should also insist that the business be taken out of Harding's control. At both of these meetings Harding was insistent that he should have fifty-one per cent ownership of the new concern and the others were offering him forty per cent. Gold insisted that Harding must give up his control of the business, and told Harding that if the then outstanding checks were not paid he might lay himself liable to criminal prosecution as well as that he would also be suspended or expelled by the exchange. On Tuesday, April 4, the final meeting was held at the bank, at which the agreement was consummated, Harding, Gold, Feldes, Nelson, Sener, Elward, a lawyer representing the bank, and Risk, a lawyer representing Harding, being present. The preliminary draft of the contract and all its terms were discussed, and when the whole had been gone through with, a new agreement was drafted. The only great difference among the parties was upon the question what interest Harding should have in the new firm. Finally Harding, though not entirely satisfied, consented to the terms on the advice of his attorney and signed the contract.

There is no evidence in this record of any false representations made to Harding by any of the four defendants, Feldes, Nelson, Sener and Davis, with regard to the condition of his business or his standing with the bank. ·There

is no evidence that either Gold or Stafford was in any way interested or in agreement with the defendants in obtaining Harding's consent to the contract with them. Gold was interested only in his bank and Stafford as president of the Chicago Live Stock Exchange. There is no evidence of any conspiracy between any of the parties to this cause to defraud Harding.

Evidence was introduced as to the action of the defendants toward Harding after the corporation was formed and the new business entered upon, but that evidence is in regard to differences that arose afterward as to the management of the affairs of the corporation, and nothing is shown indicating that the actions of the defendants had any connection with a previous plan to injure Harding, to take any unfair advantage of him or to induce him to enter into a disadvantageous contract. No one was in a position to know more about the business than Harding, or as much. He formed his own judgment with full knowledge and without undue persuasion. It cannot be said that it was a disadvantageous contract for him, all things considered. The charge of fraud is not sustained by the evidence.

The decree of the circuit court is manifestly against the weight of the evidence, and the Appellate Court should have reversed it for that reason. The Appellate Court's opinion is erroneous. It treats the case as if the cause of action in the injunction suit were the same cause of action as that set out in the cross-bill, and applies the rule of *res judicata,* which applies in such cases, that the judgment or decree in the first case is conclusive on the parties not only of all questions actually litigated and determined but of all questions which might have been litigated and determined. The causes of action were not the same, and therefore the rule which should have been applied is that the first decree is *res judicata* only of the question or questions, if any, actually litigated and determined in the first case which are common to the two cases.

The judgment of the Appellate Court is right. The circuit court should have granted the relief prayed by the amended bill of complaint and dismissed the cross-bill for want of equity. Since it is the judgment, only, and not the opinion, which forms the basis of our judgment, regardless of the opinion the judgment of the Appellate Court is affirmed.

*Judgment affirmed.*