# EAST MILL CREEK WATER CO. et al. v. SALT LAKE CITY.

No. 6788.   Decided June 18, 1945.   (159 P. 2d 863.)

See 17 C. J., Contracts, sec. 294; 30 Am. Jur., 918.

*Cheney, Jensen, Marr & Wilkins* and *Paul B. Cannon,* all of Salt Lake City, for appellants.

*E. Ray Christensen, Homer Holmgren* and *A. Pratt Kesler,* all of Salt Lake City, for respondent.

WADE, Justice.

This action was brought by East Mill Creek Water Company, a corporation, and some of its stockholders on behalf of all similarly situated, against Salt Lake City, to obtain a declaratory judgment interpreting the provisions of a contract affecting an exchange of water, entered into between the company and the city on July 19th, 1923. In the trial court the city prevailed and the plaintiffs appeal to this court.

At the time the contract was entered into the company and its stockholders were the owners of the right to the use of both summer and winter waters in Mill Creek, for irrigation and culinary purposes, through three ditches which were known as the "Amos Neff Ditch," the "Frank-

lin and John Neff Ditch" and the "Brigham Young Ditch." This was mountain water suitable for culinary purposes and constituted more than a third of all the waters of Mill Creek. Mill Creek is southeast of Salt Lake City, and the area on which this water had been used was adjacent to the city limits, roughly between 27th and 39th South Streets and 20th and 27th East Streets. Prior thereto, they had no water main or pipe-line system and both culinary and irrigation water was conveyed through open ditches. Salt Lake City had just passed through a period of rapid growth and was under the necessity of increasing its culinary water supply. For that purpose it approached the owners of these waters with a proposition to exchange other waters suitable for culinary and irrigation purposes for their water rights in Mill Creek. To effect such an exchange the corporation was formed, and the owners transferred all of their said water rights to the corporation in exchange for proportionate shares of stock therein, consisting of two classes of stock, one of which entitled them to the use of irrigation and the other to the use of culinary water.

After the company had been formed it entered into the contract in question with Salt Lake City. The parts thereof which are necessary for an understanding of the questions presented in this case are as follows:

### "Contract.

"This agreement made and entered into this 19th day of July, 1923, by and between East Mill Creek Water Company, a corporation * * * (hereinafter referred to as the 'company') and Salt Lake City, a municipal corporation * * * (hereinafter referred to as 'city'),

"Witnesseth:

"Whereas, the company is the owner of certain waters and water rights in Mill Creek, * * * and

"Whereas, the city is the owner of certain other waters which may be used for irrigation purposes, and

"Whereas, the city is desirous of securing the use of the waters owned by said company, and the company is willing to transfer to

the city the right to use of its said waters upon the terms, conditions and provisions as hereinafter set forth.

"Now, therefore, * * *:

### "Article I.

"Said company hereby covenants, promises and agrees as follows:

"1. The said company hereby grants, sells, conveys and transfers to said city all the waters and water rights owned by said company, together with that certain water main system herein provided to be constructed by and under the direction of the city at the cost of the company.

"2. It is understood and agreed that all of the company's rights to the waters of Mill Creek, * * * are hereby vested in the city perpetually, subject only to the conditions herein specified.

"3. That the said company will deliver the waters herein specified at a suitable point in the bed of Mill Creek such that the same can be delivered by gravity into the City's conduit; * * *

"4. That said company will pay the entire cost of the proposed water main system hereinafter specified, with the understanding that the work will be done under the city's direction.

"5. That said company will secure all necessary franchises and rights-of-way for said water main system.

### "Article II.

"The city hereby covenants, promises and agrees as follows:

"1. To furnish and deliver irrigation water perpetually or so long as it may be demanded by said company, at the heads of the above mentioned ditches or at such other points along such ditches as may be mutually agreed upon; * * * in quantity and time as follows, to wit:

"During the months of April, May and June of each year, the quantity of water equal to the combined share of said ditches in the flow of Mill Creek, less the quantity of culinary water hereinafter specified;

"During the months of July, August and September, twenty per cent more water than the combined share of said ditches, less the quantity of culinary water specified.

"2. To construct and maintain perpetually at the point of delivery of irrigation water to the company suitable measuring devices for the measurement and delivery of the water.

"3. To install, at the cost of the company as herein provided, and maintain perpetually a suitable system of water mains of such size and capacity and under such pressure as will effectively deliver the

water necessary for the use of the stockholders in a pure and wholesome condition; said water mains to be laid upon the following streets:

[Then follows a specification of the streets and other matters]

"4. To furnish and deliver in the water main system for the use of the company and its stockholders water entirely satisfactory for culinary purposes on the bases of 450 gallons daily per acre of water right or not to exceed in total 228,000 gallons daily during the months of April, May, June, July, August and September, and of 225 gallons daily per acre of water right, or not to exceed in total 144,000 gallons daily during the months of October, November, December, January, February and March, free of expense to the company; provided, that if the company or its stockholders at any time desire water in excess of the quantities specified herein, and the city has water in excess of its municipal needs, the city shall furnish to the company or its stockholders such water at the regular city water rates; said culinary water herein specified to be furnished free shall be so furnished only during the time that the territory served shall remain without the city limits and in no event for a longer period than twenty years from date hereof, after which time said water shall be furnished at the rates and under the conditions provided for the use of water by the inhabitants of the city. It is to be understood that the said culinary water to be furnished free is to be so furnished to stockholders owning at least one half acre water right; and that those stockholders owning less than that amount shall pay the regular city rates.

"5. * * *

"6. * * *

"Article III.

"It is further understood and agreed that:

"1. * * *

"2. The water for culinary use, etc. to be delivered into the water main system is to be delivered into the various sections of the system substantially in proportion to the distribution of stock as at present owned by the stockholders.

"3. All service connections from the water mains to the various houses are to be made at the expense of the owners together with the first cost and maintenance cost of meters whenever the latter are deemed necessary by the city; provided that the work of tapping the mains shall be done entirely by the city at the expense of the owners.

"4. If at any time the company shall request the installation of fire hydrants, the city shall install such hydrants as may be furnished by the company, the type and size of which shall be mutually agreed upon, at such points as the company may designate, at the expense of the company. The water used through said hydrants may be

chargeable to the company.

"5. The water furnished for culinary purposes may be any water that shall be as pure, free from pollution and as desirable for use as the waters of Mill Creek."

The territory served with culinary water under this contract is still without the limits of Salt Lake City, thus the free waters were delivered to the stockholders of the company up to July 19th, 1943. The city insists that under the contract it is only required to deliver culinary water, through master meters into the water main system provided for in the contract, and that all of such water which it does not deliver through that system to users other than the company and its stockholders (the city delivers water through this system to other users than the company and its stockholders) is thereby delivered to them and the company under the contract must pay therefor. Thus the company would have to read the individual meters, and collect from the stockholders, and would have to pay for all the waters lost in the system. The company contends that under the contract, after July 19th, 1943, the city was required to deliver the water to the individual stockholders through their individual meters and make collections therefor at the same rates and under the same conditions provided for the use of water by inhabitants of the city. To settle that and one other dispute, which will be considered later, this action was brought.

The city contends that this action is barred by a previous action involving a similar question commenced by the company on May 18th, 1938, in which the trial court entered judgment in favor of the city. In that action the company asked for a declaratory judgment interpreting this contract, and alleged, among other things, that a correct interpretation thereof would require the city to deliver the culinary water through the stockholders' individual meters, and make collections from the stockholders individually rather than from the company. In the former action the company alleged and relied on the general provisions of the contract

and the provisions which were in effect during the time that the city was required to furnish free water. It did not allege or rely on any provision which took effect only after that period had ended. Since the suit was commenced before the free water period ended there could be no bona fide dispute at that time on the interpretation of provisions of the contract which would only take effect after that period had expired. The trial court decided in favor of the city, but expressly limited the effect of its judgment to the period prior to July 19th, 1943. The present suit asks only for an interpretation of the contract as applied to the period since that time.

In this case plaintiffs concede that they are bound by the interpretation placed on the contract in the former action for the period which that decision covered. They contend, however, that the provisions which took effect only after the free water period expired, when viewed in the light of the entire contract, require that a different interpretation be placed on the contract after the expiration of that period. It is clear that the exact question now presented was not raised or decided in the former action, but defendant contends that that action is not only a bar to this action on such points and issues as were actually raised and therein decided but also on all points and issues which could have been therein litigated, and that the issues raised in this action could have been litigated in the former action.

This contention overlooks the fact that there are two kinds of cases where the doctrine of res judicata is applied: In the one the former action is an absolute bar to the maintenance of the second; it usually bars the successful party as well as the loser; it must be between the same parties or their privies; it applies not only to points and issues which are actually raised and decided therein but also to such as could have been therein adjudicated, but it only applies where the claim, demand or cause of action is the same in both cases. In such case the courts hold that the parties should litigate their entire claim, demand and cause of action, and every part, issue and

ground thereof, and if one of the parties fails to raise any point or issue or to litigate any part of his claim, demand or cause of action and the matter goes to final judgment, such party may not again litigate that claim, demand or cause of action or any issue, point or part thereof which he could have but failed to litigate in the former action. On the other hand where the claims, demand or cause of action is different in the two cases then the former is res judicata of the latter only to the extent that the former actually raised and decided the same points and issues which are raised in the latter. *Harding Company* v. *Harding*, 352 Ill. 417, 186 N. E. 152, 88 A. L. R. 563, and note thereto; *Outram* v. *Morewood*, 3 East 346, 102 Eng. Reprint 630; *Cromwell* v. *Sac County*, 94 U. S. 351, 24 L. Ed. 195, 30 Am. Jur. 923; "Judgments," section 179 and 180; 38 Yale Law Journal (1928-29) 299, at 311 "Res Judicata" by Robert von Moschzisker. This distinction has been followed by this court although not expressly pointed out. *Everill* v. *Swan*, 20 Utah 56, 57 P. 716; *Glen Allen Mining Co.* v. *Park Galena Mining Co.*, 77 Utah 362, 296 P. 231; *Leone* v. *Zuniga*, 84 Utah 417, 34 P. 2d 699; *Logan City* v. *Utah Power & Light Co.*, 86 Utah 340, 16 P. 2d 1097, on rehearing, 86 Utah 354, 44 P. 2d 698; *State* v. *Erwin*, 101 Utah 365, at page 422, 120 P. 2d 285, at page 315.

This action does not involve the same claim, demand or cause of action that was litigated in the former action. It does involve the interpretation of the same contract, but the question to be determined in the two actions are different, the provisions governing in this case ■ are different from those governing in the former case. In fact the provisions governing this case had not become effective at the time the other case was tried, and in view of that fact there was not nor could there then have been any bona fide dispute on the interpretation of such provisions. The plaintiffs therefore could not and did not litigate, in the former action, the same claim, demand or cause of action which they allege in this action.

Under such circumstances the former is no bar to the present action. *Leone* v. *Zuniga*, supra.

In construing the contract we will first consider paragraph 4 of Article II. Thereunder the city agree:

"To furnish and deliver in the water main system for the use of the company and its stockholders * * * for culinary purposes,"

a stated quantity of water per acre of water right daily, "free of expense to the company;" and under certain conditions to furnish water in excess of the quantities specified, "at the regular city water rates." Thus the city agreed absolutely to furnish the quantity specified, and conditionally to furnish the excess waters without any express limitation on the time during which such waters should be furnished. Then follows:

"said culinary water *herein specified to be furnished* free shall be *so* furnished only during the time that the territory served shall remain without the city limits and in no event for a longer period than twenty years from date hereof * * *."

This provision mentions "said culinary water herein specified to be furnished free," and then expressly limits the time during which such water shall be *"so* furnished." It does not, however, place any limitation on the period of time during which the specified quantity of water shall continue to be furnished. In other words it first specifies a given quantity of water which the city shall furnish the company and its stockholders free, it then expressly limits the time during which the specified quantity of water shall be furnished free, but does not provide that the specified quantity of water shall cease to be furnished. Had the contracting parties intended that the specified quantity of water should then cease to be furnished altogether, and not merely cease to be furnished free they could have very easily so provided by merely omitting the word "so." The fact that this provision expressly limits the period of time during which the specified quantity of water should be furnished *free* but avoids placing any limitation on the

time during which such quantity of water shall continue to be furnished raises a strong implication that the parties intended that the specified quantity of water should continue to be furnished thereafter.

So that we may be able to visualize the next provision in its proper setting it will be quoted with the provision we have just discussed, which is as follows:

"said culinary water herein specified to be furnished free shall be so furnished only during the time that the territory served shall remain without the city limits and in no event for a longer period than twenty years from date hereof, *after which time SAID WATER shall be furnished* at the rates and *under the conditions provided for the use of water by the inhabitants of the city.*"

The italics and capitals are ours and when read separately constitute the provision on which plaintiffs rely as the basis of their claim that the contract provides for a change in the manner of delivery of the water after the end of the free water period.

Our first problem is to determine what the term "said water" which is capitalized in the above quotation refers to. The last previous mention of water in that sentence is "said culinary water herein specified to be furnished free" and there is no other water mentioned in this paragraph to which it could refer. Plaintiffs do not claim that it refers to any other water previously mentioned in the contract but claims that it refers to culinary water in general, that it merely provides that thereafter the city will furnish the plaintiffs with culinary water on the same conditions as to quantity as well as to other conditions that it furnishes culinary water to its own inhabitants. The use of the word "said" clearly negatives that construction, and limits it to water which has been previously mentioned, and undoubtedly refers to the quantity of water specified to be furnished free. To give this term the construction urged by plaintiff would require more than mere construction of the language used; it would require us to read into the contract the term "culinary water" where the

parties have used the term "said water." That would amount to making a contract for the parties rather than construing the one they made, which is clearly not our prerogative. Thus under the terms of the contract, after the end of the free water period, the city was obligated to furnish only the same quantity of culinary water per share of water right daily as it was obligated to furnish before, but it was to be paid therefor at the same rates provided for its own inhabitants.

The contract, however, in addition to providing for a change in the cost to plaintiffs and that the same quantity of culinary water should continue to be furnished after the end of the free water period, provides that it should be furnished under the same conditions provided for the use of water by city inhabitants. Prior to this time the city did not furnish culinary water directly to the stockholders through their individual meters, but delivered the water into the water main system, and the company was required to pay to the city for all water furnished in excess of the free water. But to its own inhabitants the city furnished culinary water directly through their own individual meters, the city read the meters and billed the inhabitant for the quantity of water delivered who was required to pay therefor in accordance with the city's rules and regulations. If this provision of the contract is to have any meaning it must refer to the foregoing conditions, certainly those conditions come within the language used. We therefore hold that after the end of the free water period the city under the terms of the contract is required to furnish to the company and its stockholders the quantity of culinary water specified in accordance with the above-mentioned conditions for furnishing culinary water to its own inhabitants.

A further reason which indicates an intention to deliver the water in the manner and under the conditions above stated after the end of the free water period is the fact that one of the methods of terminating that period was the annexation of the territory served to the city. If that

had been done, then the stockholders who thereby would have become inhabitants of the city would have then been entitled regardless of their contract to the same service of city water as other inhabitants.

There are other provisions of the contract which contemplate that eventually, at least, the city would deliver the culinary water specified in the contract to the individual users and not merely to the company into the water main system. It is provided that the culinary water

"is to be delivered into the various sections of the system substantially in proportion to the distribution of stock as at present owned by the stockholders";

that the water used through the fire hydrants shall be chargeable to the company; and that individual meters would be installed whenever deemed necessary by the city. If the city under the contract was only required to deliver culinary water into the system and collect from the company, it would not be concerned with what part of the system the water was used or whether or not individual meters were installed, and it would be surplusage to say that part of the water should be charged to the company when all of it must be so charged.

This disposes of the questions raised in regard to culinary water. Plaintiffs contend that the trial court misconstrued the contract in regard to the quantity of irrigation water the city is required to furnish after the end of the free water period. Under paragraph 1, Article II the city agrees to furnish and deliver irrigation water in stated quantities "less the quantity of culinary water hereinafter specified." Plaintiff argues that the term "quantity of water hereinafter specified" refers to the free water, and that after the end of the free water period there was no quantity of water specified to be furnished and therefore none could be deducted, and that thereafter the city was required to furnish the stated quantities without deduction. It would require a strained construction of the

contract to reach the conclusion contended for even if we had held that after the end of the free water period, the city was not required to furnish the quantity of water therein specified to be furnished free after the end of the free water period, but since we have held to the contrary there is no basis whatever for plaintiffs' contention. The trial court therefore correctly held the city was only required to furnish the stated quantities less the deductions specified.

Case is reversed and remanded to the district court with directions to enter findings, conclusions and judgment in accordance with the views herein expressed. Appellants are awarded their costs.

LARSON, C. J., and TURNER, J., concur.

WOLFE, Justice (concurring in part—dissenting in part).

I agree in the holding (1) that the previous judgment of the district court is not a bar to the question raised here; (2) that the quantity of water to be delivered is limited to 288,000 gallons daily during the summer months and 144,000 gallons daily during the winter months both before and after the free period; (3) the holding regarding irrigation water. I must dissent from the holding that under the contract the city assumed the obligation to deliver culinary water direct to the stockholders after the first twenty years.

The place where the water was to be delivered by the city was of vital importance to all concerned. The contract clearly provides for delivery of culinary water to the company in the company water mains during the initial period of the contract; that is, during the first twenty years or until the area served came within the city limits. If the area served were taken into the city limits, the inhabitants of the area would automatically obtain all the rights accorded to city inhabitants. No contract provision would be needed to insure this. If the place and method of delivery were to be changed at the end of twenty years, one would naturally

expect to find an express provision to that effect. The agreement to deliver into the mains during the first twenty years is express. It is not likely that the parties would have reached an agreement to change the place and manner of delivery of the water and then leave that agreement to implication.

The contract sets out in detail such matters as the place of delivery of the Mill Creek water by the company to the city; provides that the company should pay the entire cost of the proposed water main system, that the work in constructing the mains should be done under the city's direction (this because it was contemplated that the area would be taken into the city limits and the city desired to have the mains meet city specifications), that the company would secure all necessary franchises and rights-of-way for the said water system; provides that the city should construct and maintain perpetually at the point of delivery of irrigation water suitable measuring devices for measuring the delivery of water, that the city should install the system of water mains, that the construction should be at the expense of the company, that the city should maintain the water mains perpetually, etc. In view of the detailed provisions relative to the above matters, is it likely that the parties, had they reached an agreement that the city would deliver water directly to the stockholders, maintain the distribution system, absorb the loss of water between the point of delivery in the company mains and the house of the stockholders, would yet leave all the details of such agreement to implication? The problem of delivery of water by the city directly to the stockholders would be one of the most complex problems raised by the whole contract. It is not likely that the parties reaching an agreement to that effect would not more specifically cover such supposed agreement by express provisions in the contract.

It should be noted that even during the first twenty-year period there were certain stockholders who were required

to pay for the water at regular city rates. In this regard Article II, paragraph 4, provides:

"It is understood that the said culinary water to be furnished free is to be so furnished to stockholders owning at least one-half acre of water right; and that those stockholders owning less than that amount shall pay the regular city prices."

Stockholders owning less than one-half acre of water right were never to get the water free. They were always to pay at the regular city rates, yet the city expressly during the first twenty years delivered water only into the company mains. After the free period (twenty years) for stockholders owning more than one-half acre of water right, all stockholders were to start paying regular city rates.

Mr. Justice WADE places considerable emphasis on the provisions of Art. II, para. 4 of the contract. It provides first that the city is to deliver certain specified quantities of water "in the water main system for the use of the company and its stockholders." Such water was to be furnished "free of expense to the company." If the company or its stockholders desired water in excess of the quantities specified the city agreed, if it had surplus water, to furnish the surplus water at regular city water rates. The paragraph then provided:

"said culinary water herein specified to be furnished free shall be so furnished only during the time that the territory served shall remain without the city limits and in no event for a longer period than twenty years from date hereof, *after which time said water shall be furnished at the rates and under the conditions provided for the use of water by the inhabitants of the city.*" (Italics added.)

Mr. Justice WADE puts emphasis on the italicized portion of the above quotation to support the holding that the city was obligated to deliver water directly to the stockholders. This because of the provision that the water shall be furnished under the "conditions" provided for use of water by the inhabitants of the city. I would not read this provision as imposing new or additional obligations upon the city.

Rather it appears as a limitation on the obligations placed on the city by the first portion of the paragraph. The paragraph as a whole simply states that the city must furnish specified quantities of water to the company in the company water mains free of all expense to the city. The quoted portion of the paragraph then comes as a limitation. The city no longer (after the twenty years) need furnish any water free. The company is to pay the same rates for water as the inhabitants of the city pay. The use of the water by the stockholders of the company is subject to the same burdens (conditions) as the use of water by the inhabitants of the city. Whatever limitations (conditions) the city could and did legally impose upon the use of water by the inhabitants of the city could be placed on the use of the specified quantity of water which the city agreed to furnish to the company.

It thus appears that Mr. Justice WADE reads the whole provision as though it gave the stockholders new and additional rights and imposed new and additional obligations on the part of the city. I read it as a limitation on the rights of the company and on the obligations of the city. If the area served became a part of the city, the inhabitants of that area needed no contract to insure to them rights equal to the rights of other city inhabitants. Those rights would come automatically when they became inhabitants situated within the city limits. If the contract provision relative to the delivery of water to the stockholders after they became city inhabitants is construed as an attempt to insure to them the rights of other city inhabitants, it is a useless provision. Such rights would not depend upon such a contract provision. However, from the city's standpoint there was good reason for including the provision. When the area came within the city limits the stockholders, in the absence of such provision, might well claim that the contract freed them from any obligation to pay for the water, as other city inhabitants were required to do, and also claim that they were freed from any conditions on the use of water which the city imposed on use of water by other city inhabitants.

The contract provision anticipated such a claim and provided expressly that if the area came within the city limits, the water would be furnished only at city rates and under the conditions provided for the use of water by inhabitants of the city. It was not to guarantee that they would get water at the same prices and in the same manner as other city inhabitants—they had such right without any contract. Instead, it was to prevent the stockholders, if they became residents of the city, from claiming special privileges. They were, under the provision, to get the water only "at city rates and under the conditions provided for the use of water by inhabitants of the city." Read as a restriction there is thus a reason for the provision. The paragraph first imposed on the city the obligation to furnish a specified quantity of water to the company in the company water mains free of any costs to the company. The italicized portion of the paragraph came as a limitation on this general obligation. It provided first that the city would not deliver the water free if the area served came within the city limits; that the inhabitants of the area would have to pay city rates for the water and become subject to all conditions imposed on the use of water by city inhabitants. It further specified that the water would not in any event be furnished free for more than twenty years; that after twenty years the water would be furnished only at city rates under the conditions provided for the use of water by the inhabitants of the city.

I therefore think it is wrong to read this quoted portion of the paragraph as requiring the city to furnish the water directly to the homes of the stockholders. The phrase "under the conditions" did not mean "in the same manner as." The contract throughout reads as though it were a contract between the company and the city and not as though it were a contract for the benefit of the stockholders. The irrigation water undoubtedly covered the greater volume of water. The contract as to irrigation water specifically provides for delivery to the company. The point of delivery is at the heads of certain named ditches. The city agreed to con-

struct and maintain perpetually suitable measuring devices at the point of delivery (the heads of the ditches) to measure the delivery of water. All of the above provisions clearly run directly between the city and the company.

Then follow provisions regarding the construction of a water main system. The city agrees to deliver culinary water into that system in certain specified quantities. The point of delivery is specifically in the water mains and to the company for at least so long as the area remains out of the city limits or for twenty years. The next provision relative to the conditions that are to exist after the twenty years does not repeat that the delivery will be to the company—it assumes it. Thus, to hold that this provision, specifying that the water be paid for at city rates and be "furnished under the conditions provided for the use of water by city inhabitants" after the area comes within the city limits or after twenty years, imposes upon the city the duty to deliver direct to the stockholders, seems contrary to the general scheme of the contract. It makes the contract which up to that point had been one solely with the company become at that point a contract for the benefit of third parties. The ordinary contract with a corporation is always incidentally for the benefit of the stockholders but not in the sense which the opinion of Mr. Justice WADE would hold this contract to be. His holding would make the contract, after twenty years, run directly to the stockholders who used culinary water. Delivery would not be to the company. The city would collect directly from each individual user, although, as subsequently noted, delivery would necessarily have to be in accordance with stock ownership. I do not think that the contract as written expresses that intent.

The company was organized so that the city could conveniently contract to procure the water rights of the various individual owners. After the company was formed the city contracted directly with it. None of the stockholders as such signed the contract. The distribution of the water which the city exchanged for the East Mill Creek water

was, under the articles of incorporation, to be distributed according to stock ownership. The contract between the city and the company recognizes this. Even after the twenty-year period the amount of culinary water to be distributed to the company was limited to a specified quantity, 288,000 gallons daily during the summer months and 144,000 gallons daily during the winter months. One of the chief difficulties with the construction that the city agreed by the contract to deliver water directly to the various stockholders is the fact that delivery would necessarily have to be made in accordance with stock ownership. Mr. Justice WADE holds that the limitations on quantity of water to be delivered for culinary purposes were to apply both before and after the twenty-year period. This conclusion is inescapable. First, as noted by Mr. Justice WADE, the contract must by its language be so construed. Second, Article 11, Sec. 6 of the Utah Constitution, would prohibit the city from performing an agreement to deliver an unlimited quantity of water to inhabitants of an area without the city limit. Under Article 11, Sec. 6, a municipal corporation can exchange a water right for another right of equal value, but it cannot sell, either directly or indirectly, any water right or water source. A contract to deliver to non-residents at points without the city limits all the water which those individuals wanted would be violative of this Constitutional provision.

Since the amount of water which the city could be obligated to deliver is limited to a specific amount, it must be divided among those entitled to receive it. No one stockholder could, as against the objections of any other stockholder, take more than his proportionate share. The delivery would of course be only to stockholders. This distribution of water according to stock ownership is an intercorporate administrative problem. I do not think that the city can be held to have assumed this problem of distribution by the terms of the instant contract.

The fact of the matter probably is that the parties all believed that the area served would become a part of the

city before twenty years expired. When the area came within the city limits it was contemplated that the inhabitants would acquire all the rights of other city residents and take their obligations. The city did not assume the obligation to furnish this water free in perpetuity, but agreed that in twenty years it should furnish the water only at regular city rates. But I do not believe that the city ever undertook the obligation to assume the administrative problem or the expense of distribution of the water to the various stockholders.

The provision requiring the company to pay for water taken through fire hydrants placed on the system by the city does tend to support the position taken by Mr. Justice WADE. One naturally asks: Why would it be provided that the company would pay for the water taken from the fire hydrants if the parties all understood that the company would pay for all water delivered in the mains? The city answers that in case of fire, anyone, including the city, might take the water from the hydrants. Individuals who owned no stock in the company might also take water therefrom. The city takes the view that this provision, requiring the company to pay for the water, was put in to eliminate any dispute as to whether the company should pay for water so taken.

The strongest point against the city is the provision in which it is provided:

"All service connections from the water mains to the various houses are to be made at the expense of the owners together with the first cost and maintenance costs of meters whenever the latter are deemed necessary by the city at the expense of the owners."

Why would this contract specify that the owners of the houses should pay for the costs of installation of the service connections? If the city had only the duty to deliver water to the water mains, it would be purely an intercorporate matter who paid for the service connection. The city would not care whether the company paid it or made the individual

owner pay it. The existence of the provision in the contract squints at the fact that the contract may have contemplated dealings between the city and the owners. The same can be said as to the installation of meters where the city deemed them to be necessary. If the company paid for all water as it came into the mains, the city would have no cause for wanting the right to have meters installed in the intakes of the various houses. Both of these things indicate that the city was to deliver directly to the water users. But part of the strength of any argument that can be made upon the basis of the above-quoted provision is lost by the fact that the provision was to be in effect both before and after the expiration of the free period. Since it applied both before and after, it weakens any argument that this provision evidences an intent to change the method of delivery of water after the twenty-year period. During the first twenty years there was clearly only an obligation to deliver into the mains. It was anticipated that the city would include this area before the twenty years elapsed. There was absolutely no need for these provisions during the first twenty years under any construction of the contract unless it was designed to cover situations which would arise if the area, during that time, came within the city limits. It is fairly clear from the whole contract that the city contemplated providing for the case where the area was included in the city limits. That the city wanted to make sure that the stockholders, after becoming city inhabitants, did not by virtue of this contract claim a favored position over other city inhabitants. Thus if the area came within the city limits the city by this provision made certain that if connections were made the owners, and not the city, as in the case with regular inhabitants, would pay for the connection.

The provisions upon which Mr. Justice WADE bases his holding that the city undertook by this contract the additional obligation to deliver water directly to the stockholders, were all, in my opinion, designed to limit the city's obligation. If the area came within the city limits, the city by these provisions could charge the stockholders at

regular city rates, could impose the same conditions regarding the use of water on the stockholders of this company as it placed on all other inhabitants, and if it were necessary to install water meters at the homes of the various stockholders, the city could require the stockholder-owner to pay for the costs of this installation. When the whole scheme of the contract is considered it outweighs any argument based upon the provisions regarding payment of meters and connections by the owners. I do not believe that the city by this contract agreed to deliver water directly to the stockholders. I therefore dissent from the order reversing the judgment of the lower court.

McDONOUGH, J., concurs in the views expressed in the concurring-dissenting opinion of WOLFE, J.